JAMES A. TRAFICANT, JR., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 37845-84.          Filed September 10, 1987.

*William J. Gordon, Jr.*, for the petitioner.

*Richard S. Bloom* and *Craig S. Morford*, for the respondent.

WILLIAMS, *Judge*: The Commissioner determined a deficiency in Federal income tax for petitioner's 1980 taxable year in the amount of $95,429.78 and an addition to tax pursuant to section 6653(b),[1] in the amount of $47,714.89.[2] The issues this Court must decide are (1) whether petitioner failed to report income on his 1980 Federal income tax return, and if so, (2) whether any portion of the resulting underpayment of tax is due to fraud with intent to evade payment of Federal income tax within the meaning of section 6653(b).

## Preliminary Evidentiary Matters

Prior to the trial of this case, petitioner asserted his Fifth Amendment privilege against self-incrimination in response to certain interrogatories of respondent. Before discussing the merits of petitioner's case, we reiterate that petitioner's properly asserted Fifth Amendment privilege against self-incrimination limits the permissible scope of his inquiry into matters that are the subject of his privilege. To assure fairness to the parties to a civil proceeding, it is appropriate to impose restrictions on petitioner's introduction of evidence with respect to matters over which he has asserted the privilege. *Duffy v. Currier*, 291 F. Supp. 810 (D. Minn. 1968); *Securities Exchange Commission v. Cymaticolor Corp.*, 106 F.R.D. 545 (S.D. N.Y. 1985). The nature and extent of the restrictions depend on the importance of the matters over which the privilege is asserted. Accordingly, to prevent unfair advantage or surprise, the Court may deny petitioner the right to present evidence on such matters. *S.E.C. v. Cymaticolor Corp., supra.*

Petitioner properly invoked the Fifth Amendment privilege against self-incrimination[3] in response to interrogatories of respondent asking (1) if tape-recordings of two

---

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect during the year at issue in this case, unless otherwise indicated.

[2] In his statutory notice of deficiency, respondent also determined a deficiency of $1,634 and an addition to tax for negligence for petitioner's 1981 taxable year, based entirely on petitioner's alleged failure to report $5,165 in wages from Mahoning County Drug Programs. Petitioner did not address this issue in his petition. Therefore, petitioner is deemed to have conceded the deficiency and addition to tax for his 1981 taxable year.

[3] After review of memoranda submitted by petitioner for in camera review, the Court determined that petitioner properly invoked the privilege. See this Court's memorandum sur order in this case of June 9, 1986, and order of July 8, 1986.

meetings (the tapes) involving petitioner and other individuals, discussed in more detail below, accurately reflected conversations which took place and in which petitioner participated, and (2) if not, what conversations actually took place.[4] Respondent sought petitioner's explanation under oath of his understanding of the statements recorded on the tapes. Petitioner, who is the central figure and participant in the recorded conversations, is the only witness who could explain the meaning and substance of his statements on the tapes. He has, however, refused to be examined on these matters under oath, and we believe that he should not be permitted to construct his explanation indirectly through others while avoiding examination under oath on these matters. Because of the central importance of the recorded conversations both to the fraud allegations and the deficiency determination in this case, and because petitioner is the best source of direct evidence of those conversations, we prohibited petitioner from introducing any testimony or other evidence with respect to the statements recorded on the tapes. See *S.E.C. v. Cymaticolor Corp.*, *supra*; *In re Anthracite Coal Antitrust Litigation*, 82 F.R.D. 364 (M.D. Pa. 1979); cf. *Baxter v. Palmigiano*, 425 U.S. 308 (1976). Otherwise, petitioner would be allowed to adduce evidence that would be incomplete without his testimony, which respondent has been foreclosed from examining, and that would unjustly hobble respondent in bearing his burden of proof on the fraud issue.

At the suppression hearing, one of the issues before the Court was whether the tapes were authentic. Respondent called a number of witnesses who were present during some or all of the recorded conversations on the tapes to verify the tapes' accuracy. These witnesses testified that the tapes accurately reflected actual conversations occurring during two separate meetings in which they had participated at the home of Charles and Orlando Carabbia's mother. Petitioner

---

[4]The tapes were the subject of a motion to suppress evidence filed by petitioner on June 2, 1986. A hearing was held on this motion on July 14 and 15, 1986, in Washington, D.C. Petitioner's motion to suppress was denied, and the tapes were admitted subject to pending relevancy and hearsay objections. See this Court's Bench Opinion of July 15, 1986, Transcript of Hearing, July 14-15, 1986, at 442-447. At the trial, the Court overruled petitioner's objection to the admission of the tapes on grounds of relevancy. Following the post-trial submission of briefs by the parties, the Court overruled petitioner's hearsay objections. See memorandum sur order of Feb. 25, 1987.

called no witnesses but sought to cross-examine respondent's witnesses on specific statements recorded on the tapes. We prohibited petitioner from pursuing on cross-examination any line of questioning directed to the content of specific statements on the tapes. In the language of the District Court in *S.E.C. v. Cymaticolor Corp.*, *supra* at 549, we prevented petitioner "from offering into evidence any matter relating to the factual bases for his denials and defenses as to which he has asserted his fifth amendment rights." It does not matter that petitioner sought to adduce this evidence on cross-examination of respondent's witnesses. If petitioner had called these witnesses and attempted on direct examination to elicit testimony on specific statements on the tapes, we would have precluded the testimony. Respondent's calling these witnesses does not eliminate the potential for unfair surprise or the prejudicial effect of petitioner's inquiring into the very subject matters which he has properly refused to testify about.

It should also be plainly evident that a taxpayer's assertion of the privilege may not be used to avoid meeting his burden of proof. *United States v. Rylander*, 460 U.S. 752, 761 (1983); see *Steinbrecher v. United States*, 712 F.2d 195, 198 (5th Cir. 1983). Indeed, in civil cases the Court may draw a negative inference from facts over which petitioner has asserted his Fifth Amendment privilege against self-incrimination. *Baxter v. Palmigiano*, 425 U.S. 308 (1976). The negative inference we have drawn in this case is that, if petitioner had testified on the accuracy of the recordings, petitioner would have confirmed the substance of the conversations recorded on the tapes. Petitioner's silence here has not impelled the result against him, but it has confirmed the credibility which we give to the tapes. *Baxter v. Palmigiano*, 425 U.S. at 318.

### FINDINGS OF FACT

Some of the facts in this case have been stipulated and are so found. Petitioner resided at Poland, Ohio, at the time his petition in this case was filed. Petitioner is currently a member of the U.S. House of Representatives representing the 17th Congressional District of Ohio.

Petitioner campaigned for sheriff of Mahoning County, Ohio, during 1979 and 1980, and was elected as sheriff of Mahoning County in November of 1980. The issues in this case center on whether petitioner received money from certain organized crime figures during his campaign for sheriff, that was income to him which he fraudulently failed to report on his Federal income tax return for his 1980 taxable year.

The contiguous counties of Mahoning County and Trumbull County,[5] together referred to as the Mahoning Valley, are located midway between Cleveland, Ohio, and Pittsburgh, Pennsylvania. Certain factions of the Cleveland and Pittsburgh organized crime families of La Cosa Nostra (respectively, the Cleveland Faction and the Pittsburgh Faction) competed for control of certain illegal activities conducted in the Mahoning Valley during 1979 and 1980. The competing factions waged a "war," primarily during the first half of 1979, in which a number of individuals associated with both factions were killed. However, the factions operating in the Mahoning Valley were also known to negotiate and to cooperate with each other. The Cleveland Faction received a portion of the proceeds from illegal gambling activities operated in the Mahoning Valley by the Pittsburgh Faction.

The Cleveland Faction operated primarily in Trumbull County and was headed by the brothers Charles, Orlando (also known as Orland, Orlie, and O"), and Ronald Carabbia. Ronald Carabbia was in prison during 1979 and 1980 following his conviction for the murder of Danny Green, a member of a rival Cleveland organized crime faction. Charles and Orlando Carabbia continued to communicate with Ronald while he was in prison to discuss their conduct and control of organized crime activities in the Mahoning Valley. The Carabbias operated a commercial business in Struthers, located in Mahoning County, known as Crown Vending. The Carabbia brothers were well-known in the local community as violent organized crime figures. Each of the three brothers had served or was serving a prison sentence prior to or during 1980. In July of 1984, Orlando

---

[5] All county, city, or other municipal references are in the State of Ohio unless otherwise indicated.

Carabbia was convicted of conspiring to distribute marijuana during the period from June of 1980 to May of 1981, and of making a bomb, for which he was serving his sentence in Federal prison at the time of trial of this case. Charles Carabbia disappeared in December of 1980 and is presumed to be dead.

The Pittsburgh Faction controlled organized crime activities in Mahoning County (which includes Youngstown), and was headed by James Prato (also known as Brier Hill Jimmy and the Old Man) and Joseph Naples. James Prato operated a commercial business known as the Calla Mar Manor, a restaurant in North Lima in Mahoning County. By reputation in the local community, reference to the Calla Mar Manor was synonymous with reference to the unlawful activities of Prato. Both James Prato and Joseph Naples had reputations in the local community as violent organized crime figures involved in various illegal activities in the Mahoning Valley, including narcotics distribution and gambling.

Petitioner was aware that the Carabbias, Prato, and Naples were members of organized crime factions, and knew of their reputations in the community. The competing organized crime factions played a significant role in city and county elections in the Mahoning Valley during 1979 and 1980. Various city and county officers, including mayors, judges, and officials in the local political party associations, were aligned with either the Pittsburgh Faction or the Cleveland Faction. Control would, in general, be gained through bribes used for a candidate's campaign finances or for personal use. By controlling public officials, the organized crime factions could operate their illegal activities more efficiently in the Mahoning Valley. There was competition between the factions for control of specific figures, and on occasion, an official associated with one faction would change his affiliation to the opposing faction.

Petitioner first became involved in local politics as the chairman of the successful campaign of John Hudzik for Mahoning County recorder in 1975. Petitioner was involved in the subsequent campaign, also successful, of Phil Richley for mayor of Youngstown. Richley was the Democratic

candidate and had the support of the local Democratic party.

Petitioner began his campaign for sheriff of Mahoning County in September of 1979. He defeated the incumbent, George Tablack, in the Democratic primary elections held on June 3, 1980. Petitioner, as the Democratic candidate, defeated Republican candidate Terrence Shidel and independent candidate Walter Vandetti in the general election held on November 4, 1980. Petitioner assumed the office of sheriff of Mahoning County on January 5, 1981.

The principal individuals participating directly in petitioner's campaign were Andrew Chapella, Charles O'Nesti, Anthony Protopapa, Salvatore (Sam) Traficanti, and Joseph Fortine. Chapella's functions in petitioner's campaign were to raise funds, primarily through his role as liaison between petitioner and the Carabbias, and to develop support for petitioner in Chapella's hometown of Struthers. Beginning in the late 1960's, Chapella served as a city councilman for the city of Struthers for 9 years, and was president of the city council for 1 year.

O'Nesti had an informal position in petitioner's campaign performing various functions as liaison between petitioner and Prato and Naples. O'Nesti had no check signing authority and no official duties for the campaign. Prior to working for petitioner's campaign, O'Nesti had been Fire Chief for the city of Youngstown, a position to which he was appointed by the city's mayor, for 4 years.

Protopapa was one of the first to support petitioner's campaign and was the unnamed chairman of the campaign.[6] Protopapa worked with petitioner organizing the campaign committees and choosing committee coordinators. Protopapa had no check signing authority for the campaign. Protopapa signed a small number of checks for the campaign committee during the first few months of petitioner's campaign, until he discovered he was precluded from doing so by Ohio law. Nevertheless, he supervised the administration of campaign expenditures until the primary elections in June of 1980.

---

[6]Protopapa was a civil servant employed by the city of Youngstown. State law forbade him from using his name in connection with any political campaign or in working in an official capacity for any political campaign.

Sam Traficanti first met petitioner in early 1980 and worked in petitioner's campaign as a volunteer. Traficanti, who operated a trucking business in North Lima, became petitioner's most trusted associate.

Fortine is an accountant whose clients include judges, professional athletes, and executives of major unions and businesses. He has also prepared the Federal income tax returns of Prato for approximately 25 years. Fortine first became involved in petitioner's campaign in March or April of 1980. His role was to assist in raising funds for the campaign by introducing petitioner to his associates and to assist in preparing petitioner's financial campaign reports.

The chairman of petitioner's campaign was Sam Traficant, petitioner's cousin.[7] The treasurer of the campaign was Steve Farkas, petitioner's uncle, who was authorized to sign checks for the campaign. Richard H. Davis and Stephen J. Kusmus were the only other individuals with authority to sign checks for the campaign. Shirley Sikora was in charge of coordinating fund-raising events for petitioner's campaign.

Petitioner's public campaign fund-raising activities consisted primarily of soliciting contributions from individuals and of selling tickets to fund-raising events such as dinners, dances, and raffles. The price of tickets for most events ranged from $10 to $25 each.[8] However, tickets for raffles and similar events were sold for $1 to $2.50 each. Shirley Sikora coordinated all such fund-raising events for petitioner's campaign. In addition, a chairman was designated for each event who was responsible for selling tickets to the event and returning the proceeds and any unsold tickets to Sikora. Each event chairman was personally accountable to Sikora for the proceeds from the ticket sales and for any unsold tickets. If another individual sold tickets, he was accountable in the same fashion to the event chairman. In his campaign financial reports filed with the Mahoning County Board of Elections, petitioner reported the following fund-raising events:

---

[7] This individual is not related to Salvatore (Sam) Traficanti.

[8] Petitioner believed that most individuals in Mahoning County could afford to pay no more than $25 to such fund-raising events. Further, individuals contributing more than $25 were required to be reported on the candidate's campaign reports. Therefore, $25 was the maximum price for individual tickets to fund-raising events.

| Date | Event | Tickets sold and price | Value reported |
|------|-------|------------------------|----------------|
| 9/01/79 | Raffle | 2,000 at $1 per ticket | $2,000.00 |
| 1/19/80 | Cocktail party | 222 at $25 per couple | 5,156.00 |
| 4/19/80 | Dinner dance | ([1]) at $25 per person | 11,390.00 |
| 5/18/80 | Dance | 255 at $15 per couple | 3,825.00 |
| 5/19/80 | Card party | 324 at $2.50 per person | 810.00 |
| 5/23/80 | Fund raiser | 247 at $10 per person | 2,470.00 |
| 7/25/80 | Fun night | 107 at $10 per couple | 1,070.00 |
| 8/22/80 | Cocktail party | 310 at $25 per couple | 7,750.00 |
| 9/02/80 | Fun fest | 89 at $10 per couple | 890.00 |
| 9/28/80 | Raffle | 122 at $25 per ticket | 3,050.00 |
| 10/02/80 | Ladies' night | 327 at $10 per person | 3,270.00 |
| 10/09/80 | Dance | 485 at $15 per couple | 7,275.00 |
| 10/23/80 | Boxing | 1,170 at $3 per person | 3,821.00 |
| 11/01/80 | Halloween party | 244 at $15 per ([1]) | 3,666.12 |
| 11/01/80 | Raffle | ([1]) at $1 per 3 tickets | 1,040.00 |

[1]This information is not in the record.

In the primary election, petitioner did not have the support of the local Democratic party, and when he began his campaign he had difficulty selling tickets to campaign fund-raising events to the public. As a result, in the months preceding the primary election petitioner's campaign experienced severe financial difficulties.

Petitioner, seeking other sources through which he could sell tickets to raise funds for his campaign, was introduced to Orlando Carabbia by Chapella in September of 1979. Chapella served as petitioner's liaison with the Carabbias, through whom petitioner sought to sell tickets to campaign fund-raising activities. Tickets were delivered on three separate occasions by Chapella, who was the only individual to deliver tickets for petitioner's campaign fund-raising events to the Carabbias. All of petitioner's ticket sales through the Carabbias occurred prior to the primary elections.

Petitioner first sold tickets through the Carabbias in January of 1980. Chapella delivered tickets with a value of $3,000 which he had been given at a campaign committee meeting. Three to 4 weeks later the Carabbias instructed Chapella to pick up a package from Orlando Carabbia at the offices of Crown Vending in Struthers. Chapella immediately delivered the package, which contained $3,000, to petitioner. Subsequently, on two separate occasions Chapella delivered tickets having a value of approximately

$3,500 to the Carabbias at Crown Vending prior to the primary election.

Following each of these deliveries, the Carabbias telephoned Chapella to instruct him to pick up the ticket proceeds. Chapella went to Crown Vending and received a package on each occasion from Orlando Carabbia. On one or both of these occasions Orlando Carabbia also returned unsold tickets. Chapella returned the unsold tickets to Shirley Sikora. Chapella delivered each of the packages to petitioner but did not examine their contents. Petitioner subsequently gave similar or identical packages to his campaign committee at meetings held after he received the original packages from Chapella. The packages petitioner gave to the committee contained money equal to the value of the tickets delivered to and purportedly sold by the Carabbias.

Subsequent to the primary elections,, Charles Carabbia called Chapella to instruct him to pick up a package from Crown Vending which Carabbia stated was for petitioner (the package). Chapella delivered the package directly to petitioner without examining its contents. The package contained $10,000, of which $8,000 was from the Carabbias, and $2,000, in a separate white envelope in the package, was from Prato. Petitioner examined its contents. Petitioner kept this money in his home until November of 1980; at which point he gave the money to William Pearch.

Pearch, an acquaintance of petitioner, is a carpenter who worked for petitioner's campaign as a sign maker. During 1980, Pearch was undergoing severe financial difficulties, of which petitioner was aware. In May of 1980, Pearch's home was foreclosed upon to satisfy obligations in the amount of $17,698.08. Pearch used some of the money from the package for his own benefit. Petitioner recovered the package from Pearch in the spring of 1983. Petitioner presented $10,000 to the attorneys for the prosecution in his criminal trial in 1983 allegedly representing the funds from the package.[9] Petitioner recovered possession of the

---

[9]In the spring of 1983, petitioner was tried in the U.S. District Court for the Northern District of Ohio by jury on charges of accepting bribes in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. sec. 1961 et seq., and of willfully making and subscribing a false return in violation of sec. 7206(1), and was acquitted. Although repeatedly advised by this Court that his argument was without foundation, petitioner has continued to

$10,000 after the trial. At the trial of this case, the funds presented in evidence by petitioner, representing the funds from the package, totaled $9,000.

In May of 1980, at petitioner's request, Protopapa accepted $4,500 from Charles Carabbia, which he received directly from Carabbia at Fortine's office.[10] Protopapa immediately deposited the funds, together with $3,500 in cash Fortine gave him at the same meeting, into petitioner's campaign account. The $8,000 from Carabbia and Fortine was not reported in petitioner's campaign financial reports.

Petitioner accepted an additional $10,000 in cash from the Carabbias which he "washed" through the law firm of Flask & Policy and which he used in his campaign. Petitioner states in the conversations recorded on the tapes that he gave $10,000 to the law firm in exchange for checks totaling $10,000 from some of its members. Some of these checks are reported in petitioner's campaign financial reports.

Charles Carabbia introduced petitioner to Prato shortly before the primary elections. Within days after this meeting, at Prato's request, petitioner met Prato at Prato's home in Fulton Township. Prato gave petitioner $15,000 in cash in an envelope, telling petitioner "I want you to be my friend." Soon thereafter, petitioner delivered the $15,000 to Charles Carabbia at Carabbia's mother's home in Struthers. Petitioner did not report the receipt of these funds in his campaign financial reports.

After the primary elections, but before the general election in November of 1980, O'Nesti delivered to Prato 100 campaign fund-raising tickets having a value of $2,500. The delivery was made at the request of petitioner. Three to 4 weeks later, at petitioner's request, O'Nesti went to the

advance at trial and on brief the position that the jury verdict in his criminal case has res judicata effect over the issues in dispute in this case. We reiterate that petitioner's argument is meritless. This is a civil case in which the burden of proof is based on a different standard. The jury determined only that reasonable doubt existed that the accused was guilty of the offenses charged. *Helvering v. Mitchell*, 303 U.S. 391 (1938); *Neaderland v. Commissioner*, 424 F.2d 639 (2d Cir. 1970) affg. 52 T.C. 532 (1969). Accordingly, neither the doctrine of res judicata nor of collateral estoppel bars respondent from litigating the deficiency and addition to tax for fraud at issue in this case.

[10]Protopapa often went to Fortine's office to prepare campaign advertisements, to place advertisement orders with radio and television stations, or merely to visit. This was the only occasion on which he picked up funds.

Calla Mar Manor, where Prato gave him a package containing $10,000 in cash. Prato also gave O'Nesti some unsold tickets.[11] O'Nesti immediately delivered the package to petitioner at Sam Traficanti's trucking business office. Petitioner removed and handed to O'Nesti $2,500 from the package, then gave the remaining $7,500 which remained in the package to Sam Traficanti. Traficanti delivered this package to the Carabbias at the offices of Crown Vending. Petitioner did not report the receipt of these funds in his campaign financial reports.

Approximately 1 month later, O'Nesti delivered a second group of tickets to Prato, having a total value of $3,000. Some time later, O'Nesti picked up an envelope from Naples at the Calla Mar Manor, which he delivered to Sam Traficanti at Traficanti's trucking business office in North Lima. As instructed by O'Nesti, Sam Traficanti delivered the envelope to the Carabbias. One to 2 days later, petitioner gave O'Nesti $2,500 in cash. Petitioner did not report the receipt of these funds in his campaign financial reports.

O'Nesti sold tickets to other campaign fund-raising events when requested by campaign officials. O'Nesti returned the proceeds from all such sales to the individuals from whom he had obtained the tickets.

O'Nesti informed petitioner that the campaign had failed to pay certain lumber and hardware bills, primarily from Mahoning Lumber Co., a lumber yard at which O'Nesti had been employed for a number of years. Petitioner instructed O'Nesti to pay the bills with the $5,000 he had given him out of the money received from the Pittsburgh Faction, and to report the payment of those bills to Sam Traficanti. O'Nesti used the $5,000 he received from petitioner to pay lumber and other hardware bills incurred by petitioner's campaign, including one bill paid in the amount of $1,003 to the Mahoning Lumber Co., and one payment to William Pearch in the amount of $150 for the cost of repairs to Pearch's truck or automobile, which O'Nesti reported to Sam Traficanti. Petitioner did not report any of the

---

[11]O'Nesti was told by petitioner that other individuals had delivered tickets to Prato to sell.

payments made by O'Nesti in his campaign financial reports.

In November of 1980, 1 day before the general election, petitioner accepted from Prato at Prato's residence a package containing $25,000. Petitioner had asked Prato for $100,000 in "good faith money." Petitioner immediately delivered the $25,000 to the Carabbias. Petitioner did not report the receipt of these funds in his campaign financial reports.

Petitioner "washed" or exchanged $55,000 of the $60,000 he received from the Pittsburgh Faction through the Carabbias. After the funds petitioner accepted from the Pittsburgh Faction were delivered to the Carabbias, petitioner received equal amounts of cash in exchange. Petitioner directed the Carabbias to retain control of the packages containing the $55,000 from the Pittsburgh Faction.

Petitioner filed campaign financial reports, as required by State election laws, with the Mahoning County Board of Elections (the reports). Petitioner borrowed $15,000 from Carmen Taddeo, Sam Traficanti's cousin, which was reported as a loan from petitioner to the campaign. Carmen Taddeo was repaid by the campaign in the amount of $15,600 for his loan to petitioner. In addition, petitioner personally loaned the campaign a total of $14,000, which he reported as obligations of the campaign. Petitioner obtained $4,000 of the $14,000 via a loan from the Dollar Savings & Trust Co. The source of the remaining funds is not clear. None of the $14,000 was reported as repaid by the campaign. The Carabbias, Prato, and Naples were not identified as contributors or lenders in the reports, nor were the funds petitioner accepted from them reported in the reports.

Approximately 1 week after the general election in November of 1980, petitioner met with Charles and Orlando Carabbia, Sam Traficanti, and Chapella at the home of the Carabbias' mother in Struthers (hereinafter the first recorded conversation). Discussed at this meeting was the issue of petitioner's loyalty to and support for the Carabbias, and how control over organized crime activities in the Mahoning Valley would be divided between the

Cleveland and the Pittsburgh Factions. Also discussed were alternative measures under which petitioner, when he assumed office as sheriff on January 5, 1981, would respond to public accusations of wrongdoing by Don Hanni, the local Democratic Party chairman. Hanni accused petitioner of accepting bribes from organized crime figures.

The Carabbias were concerned that petitioner, whom they knew had accepted $60,000 from the Pittsburgh Faction, had divided his loyalties between the Cleveland Faction and the Pittsburgh Faction. The focus of the Carabbias' concern was the meeting that had occurred 1 week earlier between Prato and petitioner during which petitioner had accepted $25,000 from Prato. The Carabbias had been unaware of the meeting. Further, petitioner had given $5,000 of the $60,000 he had received from the Pittsburgh Faction to O'Nesti to pay lumber bills incurred by the campaign. Petitioner assured the Carabbias that his loyalty was to their faction alone, noting that he had delivered all of the remaining $55,000 of the $60,000 he had received to the Carabbias immediately after receiving the respective payments, and that he had made no specific commitments or promises to Prato, Naples, or any other individuals.[12] Petitioner told the Carabbias that the only commitment he had made was not to interfere with the Calla Mar. Petitioner explained that he had accepted the money from the Pittsburgh Faction to prevent it from being used to support his opponent in the general election, Terrence Shidel.

The loyalty of the sheriff of Mahoning County was critical to the Carabbias, who sought to gain greater control over the operation of organized crime activities in the county. For several years the Carabbias had received a percentage of the proceeds from illegal gambling activities operated in Mahoning County by the Pittsburgh Faction, as a result of their influence over petitioner's predecessor in office. Without the support of the sheriff, the Carabbias risked being precluded from participating in any fashion in the revenues derived from organized crime activities in Mahoning County. Hence, despite petitioner's many statements indi-

---

[12]Petitioner admitted that he had promised an individual "some bonds" in return for his arranging support for petitioner's campaign in the town of Campbell. Petitioner assured the Carabbias that he had not promised this individual a stake in any illegal gambling activities.

cating his loyalty and support,[13] the Carabbias continually sought assurances that petitioner had no obligations to the Pittsburgh Faction or to other individuals.[14] Petitioner warned the Carabbias, however, that the Pittsburgh Faction had a strong base of influence over numerous public officials, which gave them leverage the Carabbias could not ignore. Moreover, having given petitioner $60,000, the Pittsburgh Faction was entitled to have petitioner meet with them and to have petitioner honor his commitment to them not to interfere with the activities conducted by Prato through the Calla Mar.[15]

---

[13]The first recorded conversation includes the following:

JAMES TRAFICANT:   Because the old man [Prato] always said, "How come Charlie [Carabbia], he don't give you no money." I said, "He don't have to give me no money he's my friend." "Oh, he's your friend he don't give you no money. Hell, I gotta give money."

\*    \*    \*    \*    \*    \*    \*

JAMES TRAFICANT:   I am [with the Cleveland Faction] but I don't have to have to tell you every week. Do I ask you if you want to be with me. Have I ever?

In addition, see tape transcripts 1-7, 1-15, 1-44, 1-45, 1-75, 1-86, 1-95.

[14]The following exchange took place during the first recorded conversation:

CHARLES CARABBIA:   At the last minute you went out there at the last minute with them guys without our knowing. That's what got us worried.

JAMES TRAFICANT:   That was a decision.

CHARLES CARABBIA:   We're not worried about the [expletive deleted] power.

JAMES TRAFICANT:   That was a decision we had to make.

SAM TRAFICANTI:   I would be thinking Orlie the same way as you.

CHARLES CARABBIA:   Okay, then you know why we're talking.

SAM TRAFICANTI:   I have been there and believe me he is with you.

ORLANDO CARABBIA:   With us.

JAMES TRAFICANT:   You know if I would pull that [expletive deleted] I would have gone there, gotten $25,000 took it [expletive deleted] home. Did the money come down here?

CHARLES CARABBIA:   Yeah.

JAMES TRAFICANT:   Just the way it was delivered.

CHARLES CARABBIA:   Yeah.

JAMES TRAFICANT:   How long after?

CHARLES CARABBIA:   You gave it to me, sitting right here.

JAMES TRAFICANT:   How long after, I picked it up and I brought it to you.

CHARLES CARABBIA:   Well, right after you picked it up.

JAMES TRAFICANT:   Not very long after. (Unintel.) Am I right Sam?

SAM TRAFICANTI:   Absolutely.

JAMES TRAFICANT:   You got it just the way it was. Now I've been feeling some [expletive deleted]. I could have taken the money with me.

[15]Petitioner states in the first recorded conversation:

JAMES TRAFICANT:   Yeah. Oh I will sit with them. It's smart business for me to sit with them.

ORLANDO CARABBIA:   Why?

JAMES TRAFICANT:   If I duck and duck and duck I'm going to make a problem. I'm not going to take no money. Just don't worry about me.

ORLANDO CARABBIA:   How are you gonna * * * What do you have to sit with them for?

Much of the first recorded conversation was spent discussing the effect of public accusations by Don Hanni, the local Democratic Party chairman, that petitioner had accepted illegal contributions from organized crime figures. Petitioner sought and received assurance from the Carabbias that no one was aware the Carabbias had given illegal contributions to petitioner.[16] The Carabbias did not believe the Pittsburgh Faction had given Hanni information as to their payment to petitioner. Petitioner voiced his displeasure with the Pittsburgh Faction over their inability to control Hanni, who was putting political pressure on petitioner to debate him publicly over the nature of his campaign funding.

Petitioner believed that an effective way to respond to Hanni's accusations was to arrest Prato, Naples, Vic Calautti[17] and O'Nesti when he took office as sheriff on January 5, 1981.[18] Petitioner stated that he could report to

| | |
|---|---|
| JAMES TRAFICANT: | If they ask to sit down with me okay, now look they give what $55,000? $60,000? Now if you give the guy $60,000 [expletive deleted] thousand dollars. He won't pay you courtesy of meeting with you. What would you think? You're a businessman, what if you did it? |
| ORLANDO CARABBIA: | All right. |
| JAMES TRAFICANT: | Would you suspect something? |

[16]Petitioner engaged in the following exchange during the first recorded conversation:

| | |
|---|---|
| JAMES TRAFICANT: | That isn't from them, that's just Hanni talking. |
| CHARLES CARABBIA: | They must have told Hanni they gave you [expletive deleted] money. Because they'll never get the [expletive deleted] Carabs to come out say we gave you a [expletive deleted] dime. |
| ORLANDO CARABBIA: | You know what I mean Sam. |
| CHARLES CARABBIA: | If you understand what I'm saying. |
| JAMES TRAFICANT: | Yeah, I was thinking about that. |
| CHARLES CARABBIA: | They'll never get none of us to say that. |

\*     \*     \*     \*     \*     \*     \*

| | |
|---|---|
| ORLANDO CARABBIA: | Because the only ones that know about any money here with us is you \* \* \* |
| SAM TRAFICANTI: | Is us. |
| ORLANDO CARABBIA: | And him. |
| JAMES TRAFICANT: | Nobody else. |

[17]Vic Calautti is an associate of the Pittsburgh Faction.
[18]The first recorded conversation contains the following discussion:

| | |
|---|---|
| JAMES TRAFICANT: | (Unintel.) \* \* \* with my mind. What's to stop me from takin', January 5th and arresting all of those [expletive deleted] [Prato, Naples, Calautti and O'Nesti] for giving me money illegally to influence the political campaign against an election laws into being corrupt organized crime. |
| ORLANDO CARABBIA: | You mean \* \* \* |
| JAMES TRAFICANT: | Yeah, I bust Jimmy, Naples and Calautti, And I'll put [expletive deleted] O'Nesti in jail. (Laughter.) I had him [Charles Carabbia] set it |

the public that the Carabbias had helped him to set up the Pittsburgh Faction for an arrest for attempting to bribe him.[19] Petitioner believed that Edward Flask, an attorney in Youngstown and a member of the law firm of Flask & Policy, and Jimmy Dankers, also known as James Petrella, who controlled certain gambling activities in the town of Girard, were aware of prejudicial information with respect to the money petitioner accepted from the Carabbias. Petitioner did not believe Flask would in fact reveal such information, and Carabbia indicated he had prejudicial, compromising photographs of Flask which would ensure his silence. Charles Carabbia assured petitioner that Dankers did not know of the payments made by the Carabbias to petitioner. Petitioner emphasized that if anyone knew the Carabbias had given him illegal contributions, he would be unable to arrest the members of the Pittsburgh Faction. Further, he would be required to act as soon as he took office, because petitioner believed that any delay would cast

---

| | up for me. If you guys said anything to anyone else, I told you to tell it to him. |
|---|---|
| CHARLES CARABBIA: | Who? We never said a [expletive deleted] word. |
| JAMES TRAFICANT: | You never told Jimmy and Big Dom you gave me money? |
| CHARLES CARABBIA: | Never, I swear on my son and daughter. |
| JAMES TRAFICANT: | Okay. So when you went out there with me you went out there with me to set them up. |
| CHARLES CARABBIA: | Oh. |
| JAMES TRAFICANT: | Let them [expletive deleted] with me. |
| CHARLES CARABBIA: | (Unintel.). Now I'm on the conspiracy. (Laughter.) |

\*      \*      \*      \*      \*      \*      \*

| CHARLES CARABBIA: | But me and Orly's not, we, we're in vending that's all we do. |
|---|---|
| JAMES TRAFICANT: | You helped me set them up. (Laughter.) |

[19]In discussing this action, the petitioner states:

| JAMES TRAFICANT: | Let me ask you this. What I'm asking you, anybody else who could say you gave money? |
|---|---|
| CHARLES CARABBIA: | No. |
| JAMES TRAFICANT: | Then what are you worried about? |
| ORLANDO CARABBIA: | Nobody. (Unintel.). |
| JAMES TRAFICANT: | The only guys who gave me money are the guys I'll arrest if they keep [expletive deleted] with us. |
| ORLANDO CARABBIA: | That's what I'm giving you information that's all. |
| JAMES TRAFICANT: | Yeah. |

\*      \*      \*      \*      \*      \*      \*

| JAMES TRAFICANT: | When Hanni gets indicted fine. Then go right at it. If he gets indicted and starts running his mouth I'm going set up to bust these guys. That's my only out. (Laughter.) |
|---|---|

\*      \*      \*      \*      \*      \*      \*

| JAMES TRAFICANT: | This is what we might have to do. Or I'll go to [expletive deleted] jail. |
|---|---|

doubt on whether he took the money to set them up for an arrest and could also be seen as a defensive maneuver to hide his involvement with the Carabbias.

Petitioner met with Charles and Orlando Carabbia at a second meeting at the Carabbias' mother's home in Struthers a short time afterward (the second recorded conversation). Sam Traficanti, Chapella, and Fortine also attended.[20] By then, Carabbia had met with Dominic Mallamo[21] to inform the Pittsburgh Faction through Mallamo that the Carabbias had financed petitioner and that petitioner was loyal to the Cleveland Faction. In doing so, Charles Carabbia hoped to exert leverage over the Pittsburgh Faction. With the loyalty and support of the sheriff of the county, the Carabbias were hopeful of exerting more forceful influence on the conduct of illegal activities in the county, resulting in a greater percentage of the revenues derived therefrom.

Petitioner voiced his concern that in meeting with Mallamo and telling him that the Cleveland Faction had given petitioner money, Charles Carabbia had foreclosed the possibility of arresting Prato and the other individuals pursuant to their plan discussed at the first recorded conversation.[22] Petitioner's f concern was prompted by the discovery that information he had believed to be confidential was known to individuals who had opposed his candidacy, and who could compromise petitioner's position. By discrediting petitioner, the Pittsburgh Faction could undermine petitioner's efforts to assist the Carabbias in gaining a greater degree of control over organized crime activities in Mahoning County, and force petitioner to recognize their

---

[20]Chapella and Fortine did not attend the entire meeting, but were present only for the first half-hour and final 10 minutes of the 2-hour meeting.

[21]Dominic Mallamo (also known as Big Dom) is the uncle of James Prato. He is, however, an associate of the Cleveland Faction.

[22]Petitioner stated to the Carabbias:

JAMES TRAFICANT: And what I'm telling you that you took away my play. Well, I'm going to tell you now. I'll never take that [expletive deleted] play down.

ORLANDO CARABBIA: Let me tell you something.

JAMES TRAFICANT: Because these people aren't dumb and if there's a visiting judge that handles it, they'd [expletive deleted] appoint it just like they did with Lipari. I can't take that play. The only play I had was the one we talked about. That if they tried to [expletive deleted] with me when they suspected it, let them make the move.

CHARLES CARABBIA: All right. But let me explain to you why this was done Jimmy.

ORLANDO CARABBIA: You still got your play.

interests. Petitioner believed the Pittsburgh Faction had been attempting to force the Carabbias to admit to them that they had given money to petitioner, in order to reduce the leverage the Cleveland Faction held by revealing compromising information with respect to petitioner. The Pittsburgh Faction did in fact refuse to pay the Cleveland Faction their share of illegal gambling proceeds, arguing the money had been used to finance petitioner.

After his election, petitioner sought to provide jobs in the sheriff's department to Chapella, Fortine, and Sam Traficanti, on the basis of their loyalty to petitioner and their contribution to his campaign. Petitioner believed, however, that positions would not be available as a result of budget cutbacks in the department. Other individuals involved in petitioner's campaign for sheriff of Mahoning County were subsequently employed by petitioner in the sheriff's department. O'Nesti served as the commander of a portion of the sheriff's reserve corps—volunteers deputized to serve in the department who are trained in police procedures and licensed by the State of Ohio to carry firearms.[23] Chapella worked for the sheriff's department as a "civil processor" after retiring from his job as a dispatcher with Republic Steel in May of 1983.[24]

The two meetings discussed above were tape-recorded by Charles Carabbia. The tapes consist of two cassette tapes and contain approximately 4 hours of recorded conversation.[25] On April 24, 1981, agents of the Federal Bureau of Investigation (FBI) discovered a copy of one of the tapes (hereinafter the bread-box tape) during an investigation into the disappearance of a "hit-man" for Charles Carabbia. On June 15, 1981, after examining the bread-box tape, the agents interviewed petitioner at their offices in Austintown. In response to questions by the agents, petitioner stated he knew of, but did not know personally, Charles and Orlando Carabbia, Prato, and Naples. Petitioner stated that he had never met the Carabbias, Prato, or Naples, and that he was

---

[23]O'Nesti currently serves on petitioner's congressional staff as a liaison between petitioner's congressional district and his Washington, D.C., office.

[24]Chapella was subsequently employed for a period of 1 year by petitioner to serve on petitioner's congressional staff in Ohio. Chapella retired as a result of ill health.

[25]See note 4 above.

not investigating any of those individuals. Petitioner denied receiving money from these individuals.

The agents then played a portion of the tapes, which was stopped after approximately 15 seconds at the request of petitioner. Petitioner, whose demeanor during the interview had initially been relaxed, at this point slumped down in his chair and appeared shaken. Petitioner stated that what he had heard was true and that he had accepted money from the Carabbias. Petitioner then signed a handwritten statement prepared by one of the agents during the interview (the statement) which states:

> I, James Traficant, make the following free and voluntary statement to Robert G. Kroner Jr. and Mark S. Swanger, Jr. who have identified themselves to me as Special Agents of the Federal Bureau of Investigation. I realize, and fully understand, that I do not have to make this statement, and that it could be used against me at a later time. During the period of time that I campaigned for Sheriffe [sic] of Mahoning County Ohio, I accepted money from Orlando Carabbia, Charles Carabbia, Joseph Naples and James Prato. This money was given to me with the understanding that certain illegal activities would be allowed to take place in Mahoning County after my election, and that as Sheriffe [sic] I would not interfere with those activities. I have read this statement consisting of this page, and it is true and correct.[26]

At the request of the agents, petitioner initially agreed to cooperate with the FBI in investigating certain figures named in the tapes. Petitioner told the agents he had sufficient evidence to arrest Orlando Carabbia himself. At the conclusion of the interview, petitioner stated to the agents that he still had some money which had been given to him by the Carabbias, but that all remaining funds had gone into his campaign. Petitioner also stated that Prato had offered to do some excavating work for petitioner at petitioner's farm.

At a subsequent meeting with the FBI on June 17, 1981, petitioner stated that the amount of money he had retained from the Carabbias was $8,000, and that he would turn that money over to the FBI at a later date. At a meeting in July of 1981 with the FBI agents, however, petitioner stated that

---

[26]The Statement was the subject of a motion to suppress evidence filed by petitioner on May 19, 1986. At a hearing on this motion held on July 14 and 15, 1986, in Washington, D.C., this Court denied petitioner's motion to suppress. The statement was admitted subject to pending relevancy objections. These objections were overruled at the trial of this case, and the statement was admitted.

he no longer had the $8,000 from the Carabbias. He did not explain what had happened to the funds. Also at this meeting, petitioner refused to cooperate with the FBI in its investigation, stating that he would cooperate only if it was not made public that petitioner's cooperation was a result of the FBI's discovery of the bread-box tape, if petitioner himself had some control over the direction of the investigation so that he could protect certain individuals, and if petitioner remained as sheriff.[27] The investigating agents refused to accept petitioner's conditions.

Petitioner filed a joint Federal income tax return for his 1980 taxable year reporting income from wages from Mahoning County Drug Programs, Inc., of $27,347.51, business income of $3,199.36, and nominal amounts of income from other sources.[28] Petitioner reported adjusted gross income of $26,189.02 after deducting a loss for farming activities.

Petitioner earned a bachelor of science degree in education from the University of Pittsburgh in 1963, and a master of science and administration degree and a master's degree in counseling from Youngstown State University in 1973 and 1976, respectively. Petitioner knew that bribes and other income from illegal sources was taxable income which must be reported on a taxpayer's Federal income tax returns. Petitioner's income tax preparer had informed him of such obligations during an earlier audit of petitioner by respondent's agents for tax years preceding the year at issue in this case. Petitioner knew the funds he received from the Cleveland Faction were bribes which were taxable income to him, and he concealed his bribery income from respondent with the intent to evade tax.

## OPINION

The principal issues in this case are (1) whether petitioner accepted money, and in what amount, from the Cleveland and Pittsburgh Factions, (2) whether such money is income to petitioner which he failed to report on his 1980 Federal

---

[27]The agents had requested that in cooperating with their investigation, petitioner resign from the office of sheriff of Mahoning County. Petitioner's cooperation would have required him to follow the direction of the investigating agents of the FBI.

[28]Petitioner filed an amended return for his 1980 taxable year on which the only change was to report a child care tax credit of $135.

income tax return, and if so, (3) whether any portion of the resulting underpayment of Federal income tax is due to fraud with intent to evade the payment of tax.

Respondent argues that petitioner received $60,000 from Prato and Naples and $103,000 from the Carabbias, that such funds were given to bribe petitioner and therefore represent income to him, and that petitioner's failure to report such income was due to fraud. Petitioner does not dispute the amount of funds received from the Pittsburgh Faction but argues that he received much less than $103,000 from the Carabbias. Petitioner also contends that such funds are not income attributable to him, arguing that he delivered all of the money he received from Prato and Naples to the Carabbias without exercising control over its disposition, and that any moneys received from the Carabbias, as well as from the Pittsburgh Faction, were contributions to his political campaign and therefore are not income attributable to him. Petitioner bears the burden of proving by a preponderance of the evidence that the deficiency determined by respondent is not correct. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111 (1933).

Gross income is all income from whatever source derived, and includes income from illegal sources such as bribes, kickbacks, illegal gambling, or illegal sales of controlled substances. Sec. 61; *James v. United States*, 366 U.S. 213 (1961). Money or property is taxable income includable in a taxpayer's gross income when the taxpayer receives the money or property with no obligation to repay and with no restrictions on its disposition. *James v. United States*, *supra*. However, money given to the taxpayer or his campaign as a political contribution that is used in the campaign is not income to the taxpayer unless it is a payment intended to influence the conduct of the taxpayer as a public official. *Patton v. Commissioner*, 799 F.2d 166 (5th Cir. 1986), affg. a Memorandum Opinion of this Court.

Petitioner admits that he received $60,000 from the Pittsburgh Faction during his campaign for sheriff of Mahoning County in 1980.[29] Petitioner accepted two pay-

---

[29]Petitioner disputes respondent's contention that he received money from Naples as well as Prato, though Naples was one of the figures petitioner considered arresting on grounds of bribing a public official in connection with petitioner's plan developed during the first recorded

ments directly from Prato, the first immediately before the primary election in June of 1980 in the amount of $15,000, and the second immediately before the general election in November of 1980 in the amount of $25,000.[30] O'Nesti also delivered one package containing $10,000 between the primary and general elections to petitioner at Sam Traficanti's trucking business office in North Lima. Petitioner removed $2,500 from the package and gave it to O'Nesti. Approximately 1 month later, O'Nesti delivered a second package containing $10,000 to Sam Traficanti at Traficanti's office. Soon thereafter, petitioner gave O'Nesti a second $2,500 in cash.

Petitioner claims that none of the $60,000 he received is income to him. He argues first that $5,000 of the $60,000 he received, which he gave to O'Nesti, represented proceeds from the sale of campaign fund-raising tickets by Prato. Petitioner asserts that he exercised no control over the remaining $55,000 but acted merely as an agent to transfer the funds to the Carabbias to be returned to the Pittsburgh Faction.

Petitioner has failed to establish that the $5,000 given to O'Nesti was from the legitimate sale of campaign fund-raising tickets. O'Nesti stated he could not recall from whom he obtained the tickets he delivered to Prato, the events to which the tickets pertained, or the chairmen of those events, yet there were few events to which his purported ticket sales could have related. Further, while normal practice in petitioner's campaign was to have ticket proceeds and unsold tickets returned to Shirley Sikora or the individual for whom the tickets were sold, O'Nesti did not follow this procedure with respect to the tickets he delivered to Prato. Although individuals given tickets to sell were personally accountable for the ticket proceeds, O'Nesti delivered the two packages which he received from Prato and Naples directly to petitioner without counting their contents or determining the amount of tickets which were returned unsold. We believe this practice indicates that the funds received were not from legitimate ticket sales

---

conversation. Whether the payment was given by Naples or Prato is not material to our holding.

[30]Petitioner received the second payment after asking Prato for $100,000 of "good faith money."

and were deliberately kept from the view of the responsible campaign staff.

O'Nesti's disposition of the $5,000 reinforces our conclusion. Though O'Nesti was not authorized to write checks or to pay bills for the campaign, petitioner directed O'Nesti to use the $5,000 he had given him to satisfy obligations incurred by his campaign, primarily lumber and hardware bills from the Mahoning Lumber Co. O'Nesti used part of the $5,000 to pay a bill from the Mahoning Lumber Co. in the amount of $1,003, a payment which was not recorded in petitioner's campaign reports. O'Nesti's disposition of the remaining $3,997 is also not recorded in the campaign financial reports, including his payment of $150 to William Pearch to repair Pearch's automobile or truck.[31] These practices indicate an intent to hide the source and the use of these funds from petitioner's campaign officers, as well as from election officials. Petitioner directly controlled the disposition of the $5,000.

Petitioner claims that he never exercised any dominion or control over the remaining $55,000 received from the Pittsburgh Faction, but transferred the funds immediately upon their receipt to the Carabbias to return to Prato. We accept petitioner's claim that he turned over to the Carabbias $55,000 which he received from the Pittsburgh Faction, without exercising control over these funds. We reject, however, petitioner's claim that he gave the money to the Carabbias to be returned to the Pittsburgh Faction. Petitioner states he never trusted Charles Carabbia, yet he purports to have entrusted Carabbia with $55,000 to return to Prato. Petitioner took no action to return the money to Prato directly, and he admits that he accepted the funds to keep the money "out of circulation," to aid him in winning the election, and to prevent their use to support his opposing candidate.

Petitioner acknowledges in the first recorded conversation, that the $55,000 received from the Pittsburgh Faction was exchanged for an equal amount of funds from the Carabbias. Petitioner directed the Carabbias to retain the

---

[31] O'Nesti could not recall whether he gave money to Pearch directly or to Sam Traficanti to give to Pearch. Other payments by the campaign to Pearch are recorded in the campaign reports and are evidenced by authorized checks from the campaign.

$55,000 from the Pittsburgh Faction. From the two recorded conversations we believe that petitioner directed the Carabbias to retain the funds so as not to indicate to Prato that he was not using his money, and, in petitioner's words, "to keep that money out of circulation." Further, the Carabbias gave petitioner equal amounts in exchange because petitioner needed the money for his campaign and because petitioner might otherwise ally himself with the Pittsburgh Faction. Petitioner had sole dominion and control over the $55,000 he accepted from the Carabbias in exchange for the funds received from the Pittsburgh Faction.

Petitioner told agents of the FBI that he used the money he received to finance expenses incurred in his campaign. The record does not reflect the specific expenditures made. All payments were made in cash, and they would be difficult or impossible to discover. We need not decide how petitioner spent these funds, however, because such a finding is not material to our holding. The important fact is that petitioner accepted these funds, over the disposition of which he had full control, in exchange for his promise to use the office of sheriff to further the illegal conduct of the Pittsburgh and Cleveland Factions in Mahoning County.

Respondent contends that petitioner received, in addition to the money received from Prato, $103,000 from the Cleveland Faction. This figure is drawn from the following colloquy contained in the tapes:

| | |
|---|---|
| ORLANDO CARABBIA: | They gave sixty, what'd we give? OK. |
| JAMES TRAFICANT: | A hundred and three. |
| ORLANDO CARABBIA: | Good. So now that's two-thirds, two-thirds of the pie. |

Petitioner bears the burden of establishing that respondent's determination with respect to his receipt of $103,000 is incorrect. Rule 142(a), Tax Court Rules of Practice and Procedure. Petitioner argues that the $103,000 figure is inaccurate and is one which was deliberately inflated to reassure the Carabbias of their significant monetary support for petitioner. Petitioner contends further that with the exception of the $10,000 package delivered to him by Chapella, any money he did receive from the Carabbias

represented proceeds from the legitimate sale of campaign fund-raising tickets.

The record amply demonstrates that petitioner received money from the Carabbias representing funds other than proceeds from the sale of tickets. Petitioner acknowledged this fact throughout the first and second recorded conversations.[32] We conclude that petitioner has failed to refute respondent's determination that he received $103,000 from the Carabbias. However, petitioner has established that this $103,000 figure includes the $55,000 of funds swapped for money received from the Pittsburgh Faction. Petitioner, therefore, received a total of $108,000 from the Cleveland and Pittsburgh Factions, consisting of $103,000 from the Cleveland Faction and $5,000 from the Pittsburgh Faction. Of the $103,000 from the Cleveland Faction, $55,000 was "washed" by the Carabbias and $48,000 came directly from the Carabbias. Of the $48,000 of new money from the Carabbias $28,000 is specifically accounted for in the record before us.

Through Protopapa, petitioner accepted $4,500 from Charles Carabbia in May of 1980. Protopapa was instructed by petitioner to pick up the money from Carabbia at Fortine's office. In addition, Fortine gave Protopapa an additional $3,500 in cash.[33] Protopapa deposited the $8,000 he received at Fortine's office in petitioner's campaign

---

[32]In addition to the statements quoted in our findings of fact, the following colloquys ensued during the first recorded conversation:

JAMES TRAFICANT: That's the bottom weapon that I have. I never said you gave me money, to anybody.
CHARLES CARABBIA: Who us?
JAMES TRAFICANT: Yeah. And you never said to Dom and Jim you gave me money.
CHARLES CARABBIA: Let me I'll tell you don't worry about us, Jimmy don't worry about us.
JAMES TRAFICANT: Okay.

    \*      \*      \*      \*      \*      \*      \*

JAMES TRAFICANT: All right I did make several statements to them [Prato and Naples] so Sam under oath could say when they ask you what Carabbia, did they give you any money. Jimmy says they don't have to give me money. They're friends, they're like family, for years.
SAM TRAFICANTI: Put a [expletive deleted] lie detector test on that one.
JAMES TRAFICANT: No, don't admit to no lie detector test.
SAM TRAFICANTI: No, I'm not gonna admit to nothing Jimmy believe me.

[33]This was the only instance in which Protopapa went to Fortine's office to accept money. Fortine's payment was not reported in petitioner's campaign reports (and neither was Carabbia's). Petitioner has failed to adduce any evidence to establish that the $3,500 from Fortine represents a political contribution which is not income to him. Accordingly, we conclude that the $3,500 Protopapa picked up for petitioner from Fortine is income to petitioner.

account. These funds were not proceeds from ticket sales—only Chapella delivered tickets to the Carabbias to sell, and Chapella himself picked up the proceeds from the Carabbias for each of his three ticket deliveries. Petitioner has failed to establish that the disposition of these funds was not directed by him.

Petitioner also controlled the disposition of the $10,000 he received from Charles Carabbia through Chapella. Petitioner held these funds in his home until the general election in November of 1980, after which he delivered the money to William Pearch. Petitioner was aware Pearch was experiencing substantial financial difficulties and that Pearch's home had been sold in a foreclosure sale. Pearch in fact used some of the money for his own benefit. After having first admitted his receipt of these funds, petitioner denied to agents of the FBI in a meeting in 1981 that he had retained these funds. In the spring of 1983, however, petitioner retrieved the funds from Pearch. Although he offered $10,000 cash in evidence in his criminal trial, the funds in evidence in this trial total only $9,000. The difference is unexplained.

Petitioner claims that he retained possession of the funds to use them as evidence in a possible "sting" against the Carabbias. We find the record barren of evidence to support petitioner's claim. Petitioner took no action against the Carabbias while he was sheriff, yet he admitted to agents of the FBI that he had sufficient evidence to arrest Orlando Carabbia. Petitioner admitted to agents of the FBI that he accepted money from the Carabbias with the understanding that certain illegal activities would be allowed to take place, and signed a confession to this effect. Indeed, petitioner's statements and assurances to the Carabbias made during the recorded conversations convince us that his aim was to cooperate with, and not to "sting," the Carabbias. Petitioner's action in turning over the $10,000 from Charles Carabbia to William Pearch is inconsistent with any intent to hold the funds as evidence in a "sting." Therefore, we do not believe petitioner's claim that he was holding the funds as evidence.

In addition, petitioner admitted in the first recorded conversation that he had "washed" $10,000 from the

Carabbias through the law firm of Flask & Policy.[34] Petitioner has introduced no evidence to demonstrate he did not have full control over the disposition of these funds. Petitioner denies "washing" any funds through the law firm of Flask & Policy. We believe petitioner's admissions in the first recorded conversation however, and thus, we do not believe this portion of his trial testimony. We find in the record specific evidence that petitioner accepted $28,000 from the Carabbias as part of their plan to use the sheriff's office to further their criminal conduct.

In addition, we note that the evidence strongly suggests that petitioner received additional funds from the Carabbias. Notably, petitioner himself received three packages from the Carabbias following Chapella's delivery to the Carabbias of tickets for each of three campaign fund-raising events. Petitioner was thus afforded the opportunity to skim funds from the packages before delivering the packages to his committee staff. Although the Carabbias purportedly sold tickets to three fund-raising events, all of which occurred prior to the primary election, Chapella was unable to recall which of the five pre-primary events the tickets related to, the approximate dates of the events, or the number of tickets sold. Despite being personally responsible to Sikora for both ticket proceeds and unsold tickets, Chapella did not deliver the packages directly to Sikora, which was the procedure normally followed in the campaign. Instead, without counting the money, Chapella turned over each package directly to petitioner. We conclude, therefore,

---

[34]In the first recorded conversation the following exchange took place:

JAMES TRAFICANT: Don't forget now (unintel.), I had taken $10,000 down to Flask.

ORLANDO CARABBIA: For what.

JAMES TRAFICANT: 10 of our thousand down to Flask for him to give me some checks to cover up some of my contributions.

ORLANDO CARABBIA: Oh.

CHARLES CARABBIA: You worried about him?

JAMES TRAFICANT: No, but I don't think he would say anything if I took this action.

CHARLES CARABBIA: Well if you got some pictures would you worry about him?

JAMES TRAFICANT: No, here's what I'm saying.

CHARLES CARABBIA: Do you know what kind of picture I'm talking about?

JAMES TRAFICANT: Naw, but here's what I'm saying. If he *says* Traficant *covered up* money, by coming down here and * * *

CHARLES CARABBIA: That just tells you.

JAMES TRAFICANT: I, I could say this, yeah I did that. I did that with some of the fund raisers that I raised, to test Flask, then have to bust Flask.

that petitioner accepted a total of $108,000 from the Pittsburgh and the Cleveland Factions.

Respondent contends that the money petitioner received was given to him as a bribe from both the Pittsburgh and the Cleveland Factions and is, therefore, income to petitioner. *James v. United States*, 366 U.S. 213 (1961). We agree. On the two occasions when he personally gave money directly to petitioner, Prato told petitioner "I want you to be my friend." In return, petitioner made a commitment to Prato that he would not interfere with Prato's operation of illegal gambling activities, which he honored.[35] Petitioner told Prato he "would not mess with his Calla Mar." The Calla Mar Manor, a commercial business operated by Prato, is reputedly identified with the operation of illegal activities conducted by Prato. Petitioner benefited by paying off unreported campaign debts with $5,000 of the money that he took from Prato directly. Although the remaining $55,000 that he accepted from the Pittsburgh Faction was exchanged for new cash from the Carabbias, petitioner felt committed to honoring his obligations to the Pittsburgh Faction on the basis of their having given him a total of $60,000 in cash. Furthermore, petitioner admitted to agents of the FBI that he had accepted money from the Pittsburgh Faction with the understanding that he would not interfere

---

[35] In the first recorded conversation petitioner states:

JAMES TRAFICANT: And here's what I said. I said no one will mess with the Calla Mar. That was my commitment. No one will mess with his Calla Mar.

\*　　　\*　　\*　　\*　　\*　　\*　　\*

JAMES TRAFICANT: Because I, I won't go to [expletive deleted] jail. I'm going to tell you that right now.
ORLANDO CARABBIA: Right.
JAMES TRAFICANT: They will get busted.
ORLANDO CARABBIA: All right.
JAMES TRAFICANT: Second thing is though there is a possibility closing it down. I don't think that's good either, okay?
ORLANDO CARABBIA: Why?
JAMES TRAFICANT: The best thing is * * *
CHARLES CARABBIA: To protect yourself?
JAMES TRAFICANT: Yeah, yeah, to protect myself and if I close it down, I could close it down, you send somebody out there to stop some action, you know what they did with Mike Yarosh?

\*　　　\*　　\*　　\*　　\*　　\*　　\*

JAMES TRAFICANT: All right then hear me, in all honesty, why would you want to ask a question that you don't know an answer of, that you get hurt with. That action is, is so serious for me to shut them down after they've given me cash like they have, ok?

with the conduct of certain illegal activities in the Mahoning Valley, and when confronted with the bread-box tape, signed a confession to that effect. Petitioner himself viewed the money as a bribe from the Pittsburgh Faction which, if required for self-preservation, he could use as a basis to arrest Prato, Naples, Calautti, and O'Nesti in response to Hanni's public accusations of wrongdoing by petitioner. As sheriff, petitioner took no action to investigate or arrest members of the Pittsburgh Faction. Without doubt, we conclude that petitioner accepted money from the Pittsburgh Faction as a bribe. *James v. United States*, 366 U.S. 213 (1961).

We reach a similar conclusion with respect to the funds petitioner accepted from the Carabbias. During the recorded conversations, petitioner assured the Carabbias of his loyalty to their faction, and that the money he received from the Pittsburgh Faction would not sway his affiliation from the Cleveland Faction.[36] Petitioner promised to assist the Carabbias in promoting the Cleveland Faction's control over illegal activities in the Mahoning Valley.[37] Petitioner sought to hide his receipt of the money from the Pittsburgh and Cleveland Factions from his campaign officers and from election officials, which confirms to us that the money came from illegal sources. Petitioner indicated during the first and second recorded conversations that he obtained unneeded loans and "washed" funds to hide the fact he had used money from the Cleveland and Pittsburgh Factions in his campaign.[38] Petitioner signed a confession admitting

---

[36]See quoted discussion at notes 13 & 14.

[37]During the second recorded conversation petitioner stated:

JAMES TRAFICANT: I, I am gonna do it, but second of all, I am a loyal [expletive deleted] and my loyalty is here and now we've gotta set up the business that they've [Pittsburgh Faction] run for all these [expletive deleted] years and swing that business over to you, and that's what your concern is. That's why you financed me and I understand that.

CHARLES CARABBIA: That's good enough.

JAMES TRAFICANT: We made a business deal. Now what I'm saying is, how we gonna do it? Because you gotta let me know what the [expletive deleted] you're gonna do and how you're gonna do it because the only way they could stop you from doing that is by discrediting me and that's going to be their move.

[38]The first recorded conversation contains the following exchange:

SAM TRAFICANT: Now wait a minute, 15, look, shall we explain it to him? (Unintel.) Listen Charlie. The $15,000 that I just gave [the loan from Carmen Taddeo] is just for a cover-up under expense account.

JAMES TRAFICANT: On the front.

that he accepted money from the Carabbias as a bribe. We conclude that the $103,000 petitioner accepted from the Carabbias was a bribe which is income to petitioner. *James v. United States, supra.*

Petitioner argues that any funds received from the Carabbias which were not proceeds from the sale of tickets were campaign contributions, and therefore are not income to him. See *Stratton v. Commissioner*, 54 T.C. 255 (1970). The principal arguments put forward by petitioner to refute respondent's claim that the money petitioner accepted from the Cleveland and Pittsburgh Factions is income to him are based on statements he made during the first and second recorded conversations which, when taken out of context, appear to support his claims. We have carefully listened to the recorded conversations, which are independently corroborated by petitioner's confession, testimony of investigating agents of the FBI, and other evidence in the record, and we are convinced that petitioner was acting in cooperation with the members of the organized crime factions with whom he dealt. Accordingly, we conclude that the funds petitioner accepted from the Cleveland and Pittsburgh Factions, totaling $108,000, were accepted as bribes and are income to petitioner.

We must now determine whether respondent properly imposed additions to tax for fraud pursuant to section 6653(b) for petitioner's 1980 taxable year. To prove fraud pursuant to section 6653(b), respondent bears the burden of

---

| | |
|---|---|
| SAM TRAFICANT: | That's all. |
| JAMES TRAFICANT: | That'll show where this money is coming from. |
| SAM TRAFICANTI: | It has nothing to do with you or Orlie. |
| JAMES TRAFICANT: | (Unintel.) no * * * (unintel.) |
| SAM TRAFICANTI: | That money's gotta give he's gonna give it back. |
| JAMES TRAFICANT: | Gonna give it back, that's my responsibility. |

\*         \*         \*         \*         \*         \*         \*

| | |
|---|---|
| JAMES TRAFICANT: | Sam's $15,000, because I gotta show where I got the money. |
| ORLANDO CARABBIA: | Yeah, but (unintel.) * * * |
| JAMES TRAFICANT: | Wait a minute, wait a minute. When I come to the report, they're gonna say, Traficant, where'd you get 30,000. I got to show where I made the income. Now it wasn't sellin' no tickets. Everybody was laying off of me because of the party. That's why Sam got the 15,000 [loan from Carmen Taddeo]. I didn't need him to get me 15,000. |
| CHARLES CARABBIA: | Right. |
| JAMES TRAFICANT: | But now Sam got to get his 15,000 plus interest from the bank. |
| ORLANDO CARABBIA: | Okay but remember * * * |
| JAMES TRAFICANT: | In fact it wasn't even Sam it was his brother-in-law. |
| SAM TRAFICANTI: | It went through Carmen. |

establishing by clear and convincing evidence that there is an underpayment in Federal income tax for petitioner's 1980 taxable year and that some part of the underpayment is due to fraud. Sec. 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure. Respondent's burden is satisfied if he establishes that petitioner intended to evade the payment of income tax known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such tax. *Stoltzfus v. United States*, 398 F.2d 1002 (3d Cir. 1968). The existence of fraud is a question of fact and is never presumed. *Rowlee v. Commissioner*, 80 T.C. 1111 (1983).

Petitioner admits that he received a $10,000 package from Charles Carabbia in 1980 and that Carabbia intended the payment as a bribe. Petitioner retained possession of the funds, with the exception of the period during which they were held by William Pearch, and exercised complete control over their disposition. Petitioner argues, however, that the money was held as evidence in a "potential sting" against the Carabbias for bribing a public official in violation of Ohio State laws.

As discussed above, we are convinced that petitioner never intended to use the funds as evidence against the Carabbias. Petitioner undertook no investigation of and took no action against the Carabbias while he was sheriff. Petitioner kept possession of the $10,000 in cash he accepted from Carabbia until the general election in November of 1980, then delivered the funds to William Pearch. Pearch used some of the money for his own benefit. Petitioner retrieved the money prior to his criminal trial in 1983, but only $9,000 remains. Petitioner did not report the $10,000 on his Federal income tax return for 1980.

We are similarly convinced that the funds petitioner admits receiving from the Pittsburgh Faction ($55,000 of which were swapped for the Carabbias' money) constituted a bribe which is income to him. O'Nesti used $5,000, at the direction of petitioner, to satisfy unreported obligations incurred by petitioner's campaign. Petitioner delivered the packages containing the remaining $55,000 to the Carabbias, for which he received an equivalent amount in exchange for use in his campaign. None of these funds were

reported to Sikora, the responsible campaign official, or to election officials. The amounts of the respective payments and the manner in which they were accepted by petitioner were explicitly discussed in the first and second recorded conversations. Petitioner communicated to the Carabbias his commitment to the Pittsburgh Faction not to interfere with the activities associated with the operation of the Calla Mar and his obligation to respect this commitment. He also reassured the Carabbias of his commitment and loyalty to their interests in sharing in the profits of organized crime in Mahoning County. Indeed, petitioner took no action against the Pittsburgh Faction while sheriff. Petitioner did not report his receipt of this income on his Federal income tax return for his taxable year 1980, from which an underpayment in income tax results.

Based on the foregoing, we conclude that respondent has established by clear and convincing evidence that there is an underpayment in Federal income tax for petitioner's 1980 taxable year.

Further, we believe respondent has established by clear and convincing evidence that this underpayment was due to fraud within the meaning of section 6653(b). Petitioner's actions bear many of the badges of fraud. Petitioner informed agents of the FBI in 1981 that he had $8,000 remaining from the $10,000 package he received from Charles Carabbia which he would turn over to the FBI, but later told the agents he no longer had the funds. He had no explanation for the purported disappearance of the funds. Petitioner further misled the FBI agents by denying that he knew or had ever met the Carabbias, Prato, or Naples. Petitioner was aware that the funds he accepted from the Cleveland and Pittsburgh Factions, respectively, were bribes. He discussed with the Carabbias using the $55,000 they held, which petitioner had accepted from the Pittsburgh Faction, as evidence against the Pittsburgh Faction of bribery of a public official; and, petitioner admits in the recorded conversations that he accepted the money in exchange for his promise that the illegal activities conducted by the Pittsburgh Faction through the Calla Mar would continue without his interference as sheriff. Petitioner

fully expected to use his official authority to further illegal conduct and activity conducted by organized crime figures.

Petitioner discussed with the Carabbias the importance of keeping secret the fact that petitioner had received money from them.[39] Petitioner attempted to hide his receipt of these funds by obtaining unneeded loans for his campaign and by personally monitoring the purported sales of tickets through the Cleveland and Pittsburgh Factions. Petitioner had accepted a total of $103,000 from the Carabbias in exchange for his promise to support and to promote the role of the Cleveland Faction in the conduct of illegal activities in Mahoning County. Finally, petitioner's actions in general reflect an intent to conceal the source of funds he accepted; namely, by misleading agents of the FBI, by "washing" money through the law firm of Flask & Policy, and by requesting that the FBI cover up his taking money from the Carabbias.

Petitioner is well educated, and is aware of his obligation to report on his Federal income tax return all income earned, including illegal income, having been informed of such by his return preparer prior to his accepting bribes from Prato and the Carabbias. Petitioner's actions reflect an intent to evade the payment of income tax known to be owing by misleading respondent (and the FBI) and acting to conceal the illegal payments to him. Respondent has convincingly established that petitioner's underpayment of Federal income tax was due to fraud within the meaning of section 6653(b).

Accordingly, and to reflect the foregoing,

*Decision will be entered pursuant to Rule 155.*

---

[39]Charles Carabbia assured petitioner he would reveal no compromising information to anyone who would use it to harm petitioner's position:

CHARLES CARABBIA: Let me tell you something. I want you to know one thing, while we're sitting here tonight. I sat down with that one guy [Dominic Malamo] today, that old man. That old man would never say nothing to nobody. He could never take hearsay in court. That old man would never take a thing or he'd be disgraced all over the country and my [expletive deleted] mouth, don't worry about this mouth. When they come to me, I'll just tell them I don't know what you're talking about. That's it. And if they'd call you (unintel.) and say well, let them tell you where you got your money from. You tell them you'll do that and you'll subpoena me and whoever.