# United States Tax Court

T.C. Memo. 2023-150

VICTOR ATTISHA AND JOSEPHINE ATTISHA,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 21857-19.                    Filed December 18, 2023.

————

*Venar R. Ayar*, *Joseph Falcone*, and *Hayden G. Leithauser*, for petitioner Victor Attisha.

*Chelsea Megan Rebeck* and *Justin G. Esshaki*, for petitioner Josephine Attisha.

*Alissa L. VanderKooi* and *Daniel James White*, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARSHALL, *Judge*: In a notice of deficiency dated November 8, 2019, and a supplement to the notice of deficiency dated November 27, 2019, respondent determined a deficiency of $211,451 and a section 6662(a)[1] accuracy-related penalty of $42,290 for petitioners' 2017 tax year (year at issue). On December 10, 2019, petitioners timely filed a Petition disputing the notice of deficiency and the supplement to the notice of deficiency.

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. Except where otherwise indicated, monetary amounts are rounded to the nearest dollar.

**[\*2]**  The issues for decision are (1) whether petitioners had unreported income of $512,777 for the year at issue from the sale of marijuana and (2) whether petitioners are liable for a section 6662(a) accuracy-related penalty of $42,290.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the accompanying exhibits are incorporated herein by reference. Petitioners resided in Michigan when they filed their Petition.[2]

During the year at issue, petitioner operated several businesses and reported income from those businesses on petitioners' jointly filed federal income tax return for the taxable year ended December 31, 2017 (2017 return). On the 2017 return Victor Attisha's occupation was listed as "Credit Card Sales" and Josephine Attisha's occupation was listed as "Homemaker." The 2017 return was prepared by Robert J. Kainaya, a licensed accountant in the State of Michigan. On the 2017 return petitioners reported the following income: (1) rental income of $18,000 on Schedule E, Supplemental Income and Loss; (2) nonpassive partnership income of $147,646 on Schedule E, from Platinum Processing Services, LLC (Platinum Processing); (3) gross receipts of $27,124 reported on Schedule C, Profit or Loss From Business, for an ATM Sales/Credit Card Sales business; (4) gross receipts of $63,656 from a Schedule C business, Merchant Banking-ATM Machines with the business name A&S ATM, LLC (A&S ATM); (5) wages of $100,000 from Platinum Processing to petitioner reported on a Form W–2, Wage and Tax Statement; and (6) wages of $4,137 from Vincent Attisha to petitioner reported on a Form W–2. Petitioners did not report any income or activity on the 2017 return from the sale of marijuana or the operation of a marijuana business.

As discussed in detail below, petitioner operated several businesses during the year at issue. Platinum Processing was a credit card processing company organized as a domestic limited liability company under the laws of the State of Michigan on May 2, 2008.

---

[2] In a Stipulation of Settled Issues filed on May 6, 2021, the parties stipulated that if the Court determines "that there is a deficiency in income tax as well as any penalties due from petitioners for the 2017 taxable year, the parties agree that petitioner Josephine Attisha is entitled to relief from joint and several liability for the 2017 taxable year pursuant to [section] 6015(c)." Accordingly, any further reference to "petitioner" in this Opinion refers only to Victor Attisha.

[*3] Petitioner was a member of Platinum Processing along with his partner Sabah Ammouri (Ammouri). Petitioner and Ammouri each owned 50% of Platinum Processing. Platinum Processing was located at John R. Road, Hazel Park, Michigan (John R. Road location).

A&S ATM was organized as a domestic limited liability company under the laws of the State of Michigan on June 7, 2016. Petitioner was listed as the resident agent of A&S ATM in the 2017 annual statement filed with the State of Michigan on November 10, 2016.

ATM of America, Inc. (ATM of America), was incorporated under the laws of the State of Michigan on November 29, 2001. The 2017 annual report for ATM of America lists Ammouri as its resident agent, and the August 17, 2007, amendment to the articles of incorporation of ATM of America lists Ammouri as its president. Ammouri, his sister, Lydia Sitto, and her husband, Jason Sitto, were the owners of ATM of America. Petitioner represented himself as a salesperson of ATM of America. ATM of America was co-located with Platinum Processing at the John R. Road location. Several other businesses were also co-located at the John R. Road location.

Holy Moly Donut Distribution, LLC (Holy Moly Donut Distribution), was organized under the laws of the State of Michigan on December 11, 2017. Holy Moly Donut Shop, Inc. (Holy Moly Donut Shop), was incorporated under the laws of the State of Michigan on June 8, 2017. Petitioner was the resident agent and an incorporator of Holy Moly Donut Shop. There was also a second store, in the name of Holy Moly Donut Shop #2, Inc. (Holy Moly Donut Shop 2). The record does not contain the incorporation date, incorporator, or resident agent of Holy Moly Donut Shop 2. Holy Moly Donut Shop shared a commercial building with Unified Collective, an unlicensed marijuana dispensary, located at West Eight Mile Road, Detroit, Michigan (Eight Mile Road location).

In 2017 petitioner resided at Gemini Drive, Sterling Heights, Michigan. Drug Enforcement Administration (DEA) Special Agent Edward Dosch (Special Agent Dosch) was assigned to a task force in 2017 that investigated illegal drugs. Through an investigation in Oakland County, Michigan, Special Agent Dosch learned of petitioner and petitioner's potential involvement in manufacturing and distributing marijuana. On October 3, 2017, Special Agent Dosch executed a federal search warrant at petitioner's home. During the execution of the search warrant, items including U.S. currency,

[*4] marijuana, four cellular phones, an iPad, and documents were seized. During its investigation, the DEA identified six telephone numbers associated with petitioner, which were related to the four cellular phones that were seized. The DEA retrieved information, including text messages, pictures, and notes from the four cellular phones that were seized from petitioner's home using standard DEA procedures. The evidence included text messages from telephone numbers associated with petitioner by which he communicated with associates, customers, and suppliers of a marijuana operation during the year at issue. The evidence also included ledgers that contained the name, quantity, price (in some cases), and dollar value of marijuana strains; some ledger entries were undated while others were dated in the 2016 and 2017 tax years.

Simultaneously with the search at petitioner's residence, DEA agents executed a federal search warrant at West Seven Mile Road, Detroit, Michigan (Seven Mile Road location), another location associated with petitioner. Petitioner, and others, operated a business out of the Seven Mile Road location called Elevated Treats, which manufactured marijuana edibles. During the execution of the search warrant, items including sheets of paper containing suspected marijuana wax, receipt books, notebooks with handwritten notations, and a photocopy of petitioner's driver's license were seized. One of the seized items, a notebook, included detailed lists of quantities of suspected marijuana strains, the purchase prices, and the dates. At trial the Court admitted this notebook into evidence.

On February 14, 2018, DEA agents executed a federal search warrant at the Eight Mile Road location for Holy Moly Donut Shop and Unified Collective and seized U.S. currency. On the same date, DEA agents executed a federal search warrant at the John R. Road location and seized U.S. currency.

Petitioner was a defendant in criminal case No. 2:18-cr-20668, *United States of America v. Junior Asmar, Victor Attisha, and James Shammas*, in the Eastern Judicial District of Michigan. In a grand jury indictment filed on October 4, 2018, petitioner was charged with one count of Conspiracy to Manufacture, Possess With Intent to Distribute, and Distribute Marijuana; five counts of Possession with Intent to Distribute Marijuana & Aiding and Abetting; one count of Manufacturing Marijuana & Aiding and Abetting; one count of Conspiracy to Launder Monetary Instruments; and one count of Conspiracy to Structure Currency Transactions. In a plea agreement

**[\*5]** filed on June 25, 2019, petitioner pleaded guilty to Conspiracy to Manufacture, Possess with Intent to Distribute, and Distribute Marijuana. The other counts against petitioner were dismissed in exchange for his plea. In the plea agreement, petitioner admitted that he and others operated an unlicensed marijuana dispensary called Unified Collective at the Eight Mile Road location. The plea agreement also states that petitioner and others "cultivated and grew marijuana in commercial and residential growing operations . . . secreted in the Detroit metropolitan area and sold the marijuana in the Detroit metropolitan area." Finally, the plea agreement states that petitioner and others "purchased hundreds of pounds of marijuana worth over $1 million from suppliers in California and elsewhere, to sell in the Detroit metropolitan area."

As part of petitioner's plea agreement, he agreed, pursuant to 21 U.S.C. § 853, to forfeit to the United States the following assets:

(a) Fifty Thousand Dollars ($50,000.00) in U.S. Currency in Safe Deposit Box #[XXXX], located at JP Morgan Chase Bank,[3]

(b) Twenty-One Thousand Six Hundred Ninety-Eight Dollars ($21,698.00) in U.S. Currency seized from a residence in Bloomfield Hills, Michigan on February 14, 2018;

(c) One Hundred Twelve Thousand Five Hundred Twenty Dollars ($112,520.00) in U.S. Currency seized from the John R. Road location on February 14, 2018;

(d) Approximately Ninety-Nine Thousand Three Hundred and Seventy Dollars and Twenty-Six Cents ($99,370.26) on deposit seized from JP Morgan Chase Bank N.A., Checking Account No. ending 9573;

(e) One Thousand Six Hundred Eighty-Five Dollars ($1,685.00) in U.S. Currency seized from Holy Moly Donut Shop on February 14, 2018;

(f) Approximately Two Hundred Sixty-Eight Thousand Five Hundred Thirty-Five Dollars and Ninety-Seven Cents ($268,535.97) on deposit seized from JP Morgan Chase Bank, N.A., Checking Account No. ending 3236;

---

3 The Contract Entry Card for the safe deposit box states that the joint lessees of the safe deposit box were Jason Sitto, Lydia Sitto, and Ammouri.

**[\*6]**    (g) Thirty-Eight Thousand and Eighty-Eight Dollars ($38,088.00) in U.S. Currency seized from Unified Collective on February 14, 2018;

(h) Approximately One Hundred Six Thousand Four Hundred Forty Dollars and Eighty-Two Cents ($106,440.82) on deposit seized from JP Morgan Chase Bank, N.A., Checking Account No. ending 2339;

(i) Approximately Ten Thousand Dollars ($10,000.00) on deposit seized from JP Morgan Chase Bank, N.A., Checking Account No. ending 8903; and

(j) Four Thousand Four Hundred Thirty-Nine Dollars ($4,439.00) in U.S. Currency seized from Holy Moly Donut Shop on August 21, 2018.

The forfeited assets[4] listed above totaled $512,777.[5] Additionally, in the plea agreement, petitioner agreed "that there is a sufficient nexus between [the assets subject to forfeiture] and his violations." Petitioner signed the plea agreement and dated it June 1, 2019.

At petitioner's sentencing hearing his criminal defense attorney explained to the court that petitioner had agreed to forfeit approximately $500,000 and acknowledged to the court that there would be a tax assessment on the forfeiture.[6] Additionally, petitioner

---

[4] Ammouri filed an administrative claim with the DEA for a return of (1) the $50,000 seized from Safe Deposit Box #[XXXX]; (2) the $21,698 seized from the residence in Bloomfield Hills, Michigan, which was Ammouri's residence; and (3) the $112,520 seized from the John R. Road location. The DEA agreed to return the $50,000 seized from the safe deposit box and the $21,698 seized from the residence in Bloomfield Hills, Michigan but not the $112,520 seized from the John R. Road location.

[5] The Government agreed to return to petitioner $200,000 of the $268,535.97 seized from JP Morgan Chase Bank, N.A., Checking Account No. ending 3236, less any claims of the Government. This $200,000 is excluded from the $512,777 total noted above.

[6] MR. KRIGER: No. We agreed to forfeit. They seized 500 and some thousand dollars of which we -- or 700 and some -- and we forfeited 500 and some thousand, and there's going to be a tax assessment on that.

THE COURT: Okay. And so the amount given back to Mr. Attisha was —

THE DEFENDANT: Nothing.

MR. KRIGER: Nothing. The IRS is taking that for past taxes on the marijuana proceeds. So he's getting nothing back, although he can use some of it for his tax liability.

**[\*7]** addressed the court before his sentencing. Petitioner acknowledged to the court that he was involved in an unlicensed and illegal marijuana business for financial reasons.[7]

After the February 14, 2018 seizure, where the DEA seized (1) $50,000 from Safe Deposit Box #[XXXX], (2) $21,698 seized from Ammouri's residence in Bloomfield Hills, Michigan, and (3) $112,520 in U.S. currency seized from the John R. Road location, the DEA served notice of the administrative forfeiture proceedings on all interested parties. On April 2 and 10, 2018, Ammouri filed administrative claims of ownership with the DEA as to items (1)–(3) described above. On February 15, 2019, Ammouri and the DEA entered into a Memorandum of Agreement with respect to the seized assets described above. The Memorandum of Agreement states that the parties wished to resolve the matter without incurring further litigation and that therefore certain of the seized assets were returned to Ammouri. Ammouri and the DEA also stipulated that the $112,520 seized from the John R. Road location was forfeited to the United States of America pursuant to 21 U.S.C. § 881(a)(6) and that Ammouri's right, title, or interest in the $112,520 was forever extinguished.

The parties have stipulated certain Exhibits including petitioner's bank records for his personal account and business accounts for Holy Moly Donut Shop and Holy Moly Donut Distribution.[8] The bank statements for petitioner's personal account were for the period December 21, 2017, through March 20, 2018. The bank statements for Holy Moly Donut Distribution were for the period January 26 through February 28, 2018. The bank statements for Holy Moly Donut Shop were for the period December 30, 2017, through February 28, 2018. Petitioner received a $500,000 check from ATM of America dated January 4, 2018, signed by Lydia Sitto and then deposited that check into one of the bank

---

Ex. 5-J, 20 of 31.

[7] Your Honor, I wrote some things down for the past few months thinking of what I would say when I came to see you on this day.

Your Honor, I know that I made some very poor choices in getting involved in the business that is federally illegal. I was making a good living, and there was simply no reason to engage in conduct that I knew to be illegal other than for money.

Ex. 5-J, 21 of 31.

[8] This includes the bank statements for Holy Moly Donut Shop and Holy Moly Donut Shop 2.

[*8] accounts for Holy Moly Donut Shop.[9] Subsequently, amounts that nearly totaled the original $500,000 deposit were transferred to other business bank accounts for Holy Moly Donut Shop, Holy Moly Donut Distribution, and petitioner's personal bank account.

Additionally, at trial the Court admitted into evidence petitioner's Proposed Trial Exhibit 15-P titled "Membership Interest Purchase Agreement for Platinum Processing," dated December 4, 2017 (Purchase Agreement). The Exhibit is a contract for the sale of petitioner's 50% membership interest in Platinum Processing to Platinum Processing (through an assignment of his membership interest to Platinum Processing) wherein he would sell his interest in Platinum Processing for a purchase price equal to (i) Platinum Processing's cash on hand as of the closing date, plus (ii) $1,500,000, minus (iii) a "customer attrition adjustment" as defined in the Purchase Agreement. The Purchase Agreement stated that a portion of the purchase price equal to (i) the cash on hand as of the closing, plus (ii) $1,200,000 was to be paid to petitioner on the closing date.

Paragraph 5 of the Purchase Agreement defined the closing and closing date as occurring "at 10 am on December 31, 2017 or at such time and date as the parties may agree." The remainder of the purchase price was to be paid on the first and second anniversaries of the closing date subject to the customer attrition adjustment. The Purchase Agreement states that the purchase price was to be paid by the "Company" which is defined in the Purchase Agreement as "Platinum Processing Services, LLC." The Purchase Agreement was signed by petitioner as the seller and Ammouri on behalf of Platinum Processing as the buyer.

In August 2019 respondent assigned a revenue agent to review petitioner's tax liability for the year at issue and to determine whether a jeopardy assessment was appropriate. The revenue agent noticed that the 2017 return did not report any income from the sale of marijuana. The revenue agent reviewed the following information during the course of her investigation: (1) two search warrants from 2017, (2) three search warrants from 2018, (3) records regarding bank accounts and safe deposit boxes seized by the DEA, (4) petitioner's indictment, (5) court documents on PACER, (6) petitioner's plea agreement, (7) petitioner's tax returns for 2016 and 2017, and (8) Platinum Processing's Form 1065, U.S. Return of Partnership Income, for 2017.

---

[9] The memo line on the check states "Acquisition of Platinum."

**[\*9]**   On September 6, 2019, the revenue agent interviewed petitioner at his attorney's office. Petitioner answered basic background questions about himself but refused to answer any questions regarding income generated from marijuana manufacturing and sales. Petitioner also failed to provide the revenue agent with documents that she requested.

On September 20, 2019, respondent made a jeopardy assessment against petitioners for the year at issue of $358,744, which comprised a tax deficiency of $298,953 and a section 6662(a) accuracy-related penalty of $59,791. Petitioners filed an administrative appeal of the jeopardy assessment, and that administrative appeal was considered by respondent's Independent Office of Appeals (Office of Appeals). After further consideration of the jeopardy assessment by the Office of Appeals, respondent's proposed increase to petitioner's gross business income was reduced by $200,000. Shortly thereafter, respondent issued the notice of deficiency on November 8, 2019.

On November 27, 2019, respondent issued a Letter 555T and an examination report supplementing the notice of deficiency reflecting a reduction to the tax increase determined in the notice of deficiency for the year at issue. Because of this reduction, the total jeopardy assessment for the year at issue was correspondingly reduced to $253,741, which comprises a tax deficiency of $211,451 and a section 6662(a) accuracy-related penalty of $42,290. Neither petitioner filed a request for judicial review under section 7429(b) after the Office of Appeals' consideration of the jeopardy assessment.

OPINION

I.   *Jurisdiction*

The parties do not dispute that respondent issued a valid notice of deficiency and that petitioners timely petitioned the Court. *See* Rule 13(a), (c); *Hallmark Rsch. Collective v. Commissioner*, 159 T.C. 121, 131 (2022); *Monge v. Commissioner*, 93 T.C. 22, 27 (1989); *Normac, Inc. v. Commissioner*, 90 T.C. 142, 147 (1988). The notice of deficiency has been described as "the taxpayer's ticket to the Tax Court" because without it, there can be no prepayment judicial review by this Court of the deficiency determined by the Commissioner. *Mulvania v. Commissioner*, 81 T.C. 65, 67 (1983). Because of the section 6213(a) restrictions on assessment, the deficiency cases that come to our Court are typically preassessment. But section 6213(a) makes an exception for "jeopardy assessments" under section 6861, and that section authorizes the

**[\*10]** Commissioner to assess a deficiency even before issuing a notice of deficiency if he believes the assessment or its collection will be jeopardized by delay. Where the Commissioner has made a jeopardy assessment before a decision of the Court has been issued, the Court has jurisdiction to redetermine the entire amount of the deficiency and of all the amounts assessed at the same time in connection with it. § 6861(c); Treas. Reg. § 301.6861-1(c).

II.     *Burden of Proof*

Ordinarily, the statutory notice of deficiency carries with it a presumption of correctness which places the burden on the taxpayer to show that the Commissioner's determination is erroneous. Rule 142(a); *Helvering v. Taylor*, 293 U.S. 507, 515 (1935); *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *United States v. Walton*, 909 F.2d 915, 918 (6th Cir. 1990); *Traficant v. Commissioner*, 884 F.2d 258, 263 (6th Cir. 1989), *aff'g* 89 T.C. 501 (1987); *Calderone v. United States*, 799 F.2d 254, 258 (6th Cir. 1986); *Schrader v. Commissioner*, 420 F.2d 443, 444 (6th Cir. 1970), *remanding per curiam* T.C. Memo. 1968-224; *Garavaglia v. Commissioner*, T.C. Memo. 2011-228, 102 T.C.M. (CCH) 286, 298, *aff'd*, 521 F. App'x 476 (6th Cir. 2013). The Supreme Court has stated that a "'naked' assessment without *any* foundation whatsoever" is "not properly subject to the usual rule with respect to the burden of proof in tax cases" and is arbitrary and erroneous. *See United States v. Janis*, 428 U.S. 433, 441–42 (1976); *see also Weimerskirch v. Commissioner*, 596 F.2d 358, 362 (9th Cir. 1979) (concluding that the "Court erred in finding that the presumption of correctness attached to the deficiency determination" and "[a] deficiency determination which is not supported by the proper foundation of substantive evidence is clearly arbitrary and erroneous"), *rev'g* 67 T.C. 672 (1977). "In the context of unreported income, the Court of Appeals for the Sixth Circuit has held that before the notice of deficiency is entitled to a presumption of correctness, such determinations must be supported by at least a 'minimal' factual predicate or foundation of substantive evidence linking the taxpayer to the income-producing activity or to the receipt of funds." *Garavaglia*, 102 T.C.M. (CCH) at 298 (first citing *Walton*, 909 F.2d at 918–919; and then citing *Richardson v. Commissioner*, T.C. Memo. 2006-69, 91 T.C.M. (CCH) 981, 989, *aff'd*, 509 F.3d 736 (6th Cir. 2007)).[10]

---

[10] Absent a stipulation to the contrary, this case is appealable to the Sixth Circuit, and we follow the precedent of that court that is squarely on point. *See*

**[\*11]** Where taxpayers establish by a preponderance of the evidence that the Commissioner's determinations are arbitrary and excessive, then the notice of deficiency is no longer presumed correct. *Helvering v. Taylor*, 293 U.S. at 515; *Traficant v. Commissioner*, 884 F.2d at 263.

III.    *Respondent's Burden of Production Where Income Is Earned Through Illegal Activities*

In cases where the Commissioner has alleged that the taxpayer received unreported income from illegal activities, courts have held that the Commissioner has satisfied his burden to show that the determination had a minimal evidentiary foundation by introducing evidence that establishes a nexus between the taxpayer and the activity that, the Commissioner asserts, generated the unreported income. *See Solimene v. Commissioner*, T.C. Memo. 1982-370, 44 T.C.M. (CCH) 321, 324 (first citing *Suarez v. United States*, 582 F.2d 1007, 1010 n.3 (5th Cir. 1978); then citing *Llorente v. Commissioner*, 649 F.2d 152 (2d Cir. 1981), *aff'g in part, rev'g in part* 74 T.C. 260 (1980); then citing *Weimerskirch v. Commissioner*, 596 F.2d 358; and then citing *Jackson v. Commissioner*, 73 T.C. 394 (1979)).

Petitioner argues that the notice of deficiency and the supplement to the notice of deficiency are not supported by substantive evidence and therefore respondent has the burden of proving any alleged tax deficiency. Specifically, petitioner argues that respondent did not provide any direct evidence linking petitioner to any income-producing activity. Additionally, petitioner argues that even if respondent established a direct link between petitioner and the income-producing activity, respondent's calculation of petitioner's income is not supported by substantive evidence.

Respondent argues that the presumption of correctness applies here because he linked petitioner with the income-producing activity (i.e., illegal marijuana manufacturing and sales) during the year at issue. Respondent further argues that he linked petitioner with the income-producing activity through items seized from petitioner's home and other locations that were associated with petitioner, petitioner's criminal indictment, his plea agreement, petitioner's forfeiture of assets in connection with his plea agreement, and statements made by petitioner and his counsel during petitioner's sentencing hearing.

---

§ 7482(b)(1); *Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971).

[*12] Turning to respondent's calculation of petitioner's income for the year at issue, respondent argues that he had "great latitude in reconstructing petitioner's income from the illegal sale of marijuana during the 2017 tax year" because petitioner failed to keep books and records, refused to answer the Internal Revenue Service (IRS) revenue agent's questions about income that he received from the sale of marijuana in 2017, and failed to provide respondent with requested documents. Respondent argues that, absent this information and considering the other evidence that linked petitioner with the income-producing activity the year at issue, it was reasonable for him to determine that the $512,777 that petitioner agreed to forfeit to the Government as part of his plea agreement was income during the year at issue from illegal marijuana manufacturing and sales.

For the reasons discussed below, we agree with respondent and hold that (1) the presumption of correctness attaches to the unreported income determination in the supplement to the notice of deficiency, (2) petitioner has not satisfied his burden to produce evidence showing that respondent's determination is arbitrary and excessive, and (3) respondent's calculation of petitioner's income for the year at issue was not arbitrary or erroneous in the light of the evidence connecting petitioner with the income-producing activity, including his criminal forfeiture of $512,777, his failure to maintain books and records, and his failure to cooperate with the IRS revenue agent regarding income that he received from his illegal marijuana business.

As discussed above, in order for the presumption of correctness to attach to the Commissioner's determination of unreported income, the determination must be supported by a minimal evidentiary foundation. *Garavaglia*, 102 T.C.M. (CCH) at 298. In cases where the Commissioner asserts that the taxpayer generated unreported income through illegal activity, the minimal evidentiary foundation requirement is satisfied where evidence in the record shows a nexus between the taxpayer and the illegal tax-generating activity. *Solimene*, 44 T.C.M. (CCH) at 324.

Petitioner has not established by a preponderance of the evidence that respondent's determinations are arbitrary and excessive. Petitioner did not offer any testimony explaining why the amounts forfeited were not his despite conceding in his plea agreement that there was a "sufficient nexus between [the assets subject to forfeiture] and his violations." In the light of his plea agreement, it strains credulity to believe that petitioner agreed to forfeit assets that were not, in fact, his.

**[\*13]** Instead, petitioner argues on brief that the amounts forfeited were not his because there was no evidence that he owned the dispensary or made income from the sale of marijuana. Petitioner attempts to bolster this argument by further asserting that (1) he did not have a leadership role in the organization but was only one of several co-conspirators and (2) the items seized from petitioner's residence do not prove that he was the mastermind of the conspiracy. Additionally, petitioner attempts to draw parallels between the present case and *Weimerskirch v. Commissioner*, 596 F.2d 358, and *Jackson*, 73 T.C. 394.

In *Weimerskirch v. Commissioner*, 596 F.2d at 359, the notice of deficiency was premised on the Commissioner's determination that the taxpayer was in the drug business. An IRS revenue agent called by the taxpayer testified that the determination was based on statements of unidentified informants and information supplied to the IRS by law enforcement agencies. *Weimerskirch*, 67 T.C. at 673–74. The Commissioner, however, did not present any direct evidence linking the taxpayer with the drug business; instead, the Commissioner called no witnesses and introduced no evidence at all. *Weimerskirch v. Commissioner*, 596 F.2d at 359. Relying substantially on *Janis*, the U.S. Court of Appeals for the Ninth Circuit held that the Commissioner's notice of deficiency was unsupported by the proper foundation of substantive evidence and was arbitrary and excessive. *Id.* at 362.

In *Jackson*, 73 T.C. at 396–97, the notice of deficiency was also premised on the Commissioner's determination that the taxpayer was in the drug business. The Commissioner again failed to present any direct evidence to support that determination. *Id.* at 402. Instead, similarly to *Weimerskirch*, the only evidence provided was the testimony of an IRS revenue agent and a DEA special agent, neither of whom could testify as to any direct contact with the taxpayer or his activities during the relevant period. *Id.* at 400, 402–03. Concluding that the notice of deficiency was based solely on the IRS revenue agent's reliance "on a secondhand report of peripheral statements made by an unreliable informant [to the DEA special agent]," like the court of appeals in *Weimerskirch*, the Court held the Commissioner's determination arbitrary and excessive. *Id.* at 403.

Initially, we note that both *Weimerskirch* and *Jackson* were "naked assessment" cases where the Commissioner failed to introduce direct evidence linking the taxpayer with the tax-generating activity. The facts of the instant case are thus inapposite to *Weimerskirch* and *Jackson*. Here, the notice of deficiency and the supplement to the notice

**[\*14]** of deficiency were based on evidence that directly linked petitioner with the manufacture and sale of marijuana.

The factual differences between *Weimerskirch* and *Jackson* and the present case are significant. In October 2017 the DEA executed search warrants at petitioner's home and other locations linked with petitioner and seized marijuana, cash, cellular phones, drug ledgers, and notes. As discussed above, the items seized from petitioner's home included U.S. currency, marijuana, four cellular phones, an iPad, and documents. These documents included ledgers with some undated entries and some entries dated in the 2016 and 2017 tax years; the ledgers contained the names, quantities, prices (in some cases), and dollar values of marijuana strains. The evidence also included text messages from telephone numbers associated with petitioner in which he communicated with associates, customers, and suppliers of a marijuana operation during the year at issue. The items seized from the Seven Mile Road location (an address at which petitioner operated a marijuana edibles business, Elevated Treats) included sheets of paper containing suspected marijuana wax, receipt books, notebooks with handwritten notations, and a photocopy of petitioner's driver's license. Additionally, one of the seized items, a notebook, included detailed lists of quantities of suspected marijuana strains, the purchase prices, and the dates. In February 2018 the DEA executed a search warrant at the Eight Mile Road location and seized U.S. currency. Before issuing the notice of deficiency, respondent also reviewed petitioner's indictment, which described the Government's investigation and the evidence seized, and set forth petitioner's alleged involvement in an illegal marijuana business during 2017.

In addition to this evidence, respondent relied on petitioner's plea agreement, wherein he pleaded guilty to Conspiracy to Manufacture, Possess with Intent to Distribute, and Distribute Marijuana. In the plea agreement petitioner admitted to operating a marijuana dispensary, growing marijuana in commercial and residential growing operations, selling the marijuana in the Detroit metropolitan area, and purchasing hundreds of pounds of marijuana to sell in the Detroit metropolitan area. Additionally, in the plea agreement petitioner agreed to forfeit $512,777 of assets and specifically agreed "that there is a sufficient nexus between [the assets subject to forfeiture] and his violations." Moreover, at his sentencing hearing petitioner admitted that he engaged in this illegal business for financial gain. Finally, at the sentencing hearing petitioner's criminal attorney explained to the court that petitioner agreed to forfeit approximately $500,000 and

**[\*15]** acknowledged that there would be a tax assessment on the forfeiture which he described as "the marijuana proceeds."

The facts of this case stand in stark contrast to those of *Weimerskirch* and *Jackson*. Unlike those cases, where the notices of deficiency were based on statements of unidentified or unreliable informants and certain information that was given to the Commissioner by law enforcement agencies, this case involves a notice of deficiency and a supplement to the notice of deficiency that were based on many different documents directly linking petitioner with the tax-generating activity. Specifically, the notice of deficiency and the supplement to the notice of deficiency were based on the following key items: (i) evidence seized by law enforcement agencies at petitioner's home and other locations associated with petitioner, (ii) the grand jury indictment, (iii) petitioner's plea agreement and forfeiture of $512,777 that he admitted had a sufficient nexus to the crime that he pleaded guilty to, and (iv) the sentencing hearing transcript where petitioner and his counsel made statements to the court acknowledging that he had engaged in an illegal marijuana manufacturing and sales business and that the forfeited assets (that had a sufficient nexus to the violations) would be subject to tax. *See also Barrington v. Commissioner*, T.C. Memo. 2022-68, at \*7 (sustaining the Commissioner's unreported income determination where the Commissioner reasonably reconstructed taxpayers' unreported income using admissions in taxpayers' plea agreements); *McHan v. Commissioner*, T.C. Memo. 2006-84, 91 T.C.M. (CCH) 1069, 1072 (holding that taxpayer's arrest, guilty plea, subsequent criminal convictions for engaging in the illegal sale of marijuana, criminal forfeitures, and the testimony of various co-conspirators and taxpayer that he was involved in a conspiracy to possess and to sell marijuana were sufficient to support Commissioner's unreported income determination), *aff'd*, 558 F.3d 326 (4th Cir. 2009); *Franklin v. Commissioner*, T.C. Memo. 1993-184, 65 T.C.M. (CCH) 2497, 2501.

At trial petitioner objected to the introduction into evidence of most of the items listed above on the basis of hearsay, lack of foundation, and authentication. The Court generally overruled these objections and admitted the Exhibits and related testimony into evidence, subject to the parties' addressing their weight on brief. Nonetheless, we note that this Court has held that it will not find a statutory notice of deficiency to be arbitrary and excessive just because the determination has been based on hearsay or other inadmissible evidence. *See Trescott v. Commissioner*, T.C. Memo. 2012-321, at \*6–7 (citing *Dellacroce v.*

[*16] *Commissioner*, 83 T.C. 269, 280 (1984)); *see also Rosano v. Commissioner*, 46 T.C. 681, 687 (1966). Thus, even if all of the items listed above were hearsay or otherwise inadmissible (which we do not find), respondent was permitted to base the determination in the notice of deficiency on them.

We find that respondent has met his burden of introducing evidence linking petitioner with the illegal activity upon which the notice of deficiency and the supplement to the notice of deficiency are based because respondent has produced substantive evidence of petitioner's extensive activities in illegally manufacturing and selling marijuana in 2017. Accordingly, we find that respondent's determinations in the notice of deficiency and the supplement to the notice of deficiency were supported by an evidentiary foundation and are entitled to the presumption of correctness.[11] Petitioner, therefore, has the burden of proving that respondent's determinations are arbitrary or erroneous. As discussed below, petitioner has failed to carry this burden.

IV.   *Petitioner's Rebuttals of the Determinations in the Notice of Deficiency*

   A.   *Whether the Seized Assets Were Generated by a Marijuana Business in 2017*

Petitioner argues that he has met his burden of rebutting the determinations in the notice of deficiency and the supplement to the notice of deficiency because (1) the seized assets were traced to money from the sale of petitioner's business, Platinum Processing, (2) the assets belonged to third parties, and (3) the assets were other cash receipts from 2018. In support of these contentions, petitioner introduced into evidence (i) the Purchase Agreement for Platinum Processing, (ii) a check for $500,000 from ATM of America to petitioner dated January 4, 2018, and (iii) certain bank statements for Holy Moly Donut Shop, Holy Moly Donut Shop 2, Holy Moly Distribution, and one of petitioner's personal bank accounts. Petitioner argues that this evidence shows that the seized assets were income from the sale of his

---

[11] At trial petitioner objected to introducing into evidence respondent's proposed trial Exhibits marked 1011-R through 1015-R. The Court reserved ruling on these proposed Exhibits. The Court's determination (i.e., that respondent's determinations in the notice of deficiency and the supplement to the notice of deficiency were supported by a minimal evidentiary foundation) was not based on respondent's proposed trial Exhibits 1011-R through 1015-R. Accordingly, the Court need not rule on petitioner's evidentiary objections with respect to these proposed exhibits.

**[*17]** interest in Platinum Processing in 2018, receipts from Holy Moly Donut Shop in 2018, and assets that belonged to third parties, or were other receipts from petitioner's legal businesses from 2018.

Petitioner's argument on the origins of the seized assets is not consistent with the underlying documents. In particular, petitioner argues that most of the seized assets were actually proceeds from the sale of his membership interest in Platinum Processing and that the $500,000 check from ATM of America (signed by Lydia Sitto) to petitioner was an "installment" on the sale. We note that Ammouri was the other 50% owner of Platinum Processing. We further note that Ammouri, his sister Lydia Sitto, and her husband Jason Sitto were the owners of ATM of America. Under the specific terms of the Purchase Agreement, in exchange for petitioner's 50% membership interest in Platinum Processing, he was to be paid by Platinum Processing an amount equal to (i) the cash on hand as of the closing plus (ii) $1,500,000 minus a customer attrition adjustment. Moreover, the Purchase Agreement states that the purchase price was to be paid by Platinum Processing at the closing in an amount equal to the cash on hand as of the closing plus $1,200,000 "by certified check or wire transfer." Thereafter, petitioner was to be paid an additional $150,000 on the first anniversary of the closing and another $150,000 on the second anniversary of the closing, less the customer attrition adjustment. The closing and closing date was defined in paragraph 5 of the Purchase Agreement as occurring on "December 31, 2017 or at such other time and date as the parties may agree."

The check that petitioner introduced into evidence to support his position that the bulk of the seized assets originated from the sale of his interest in Platinum Processing is inconsistent with the terms of the Purchase Agreement. First, the amount of the check, $500,000, does not correspond to paragraphs 2 and 3 in the Purchase Agreement that set forth the total purchase price and the schedule on which it would be paid. On brief, petitioner characterizes the check from ATM of America as an "installment on the sale of Platinum Processing Services LLC for $500,000." However, no provision of the Purchase Agreement states that the first tranche of the purchase price was permitted to be paid in a $500,000 installment. Rather, paragraphs 2 and 3 of the Purchase Agreement are specific as to the amount and the time of the purchase price payment to petitioner. Additionally, the Purchase Agreement states that the purchase price was to be paid by the "Company," defined in the Purchase Agreement as "Platinum Processing Services, LLC." Finally, paragraph 5 of the Purchase Agreement states that the first

[*18] tranche of the purchase price was to be paid at the closing which was stated to occur "at 10 a.m. on December 31, 2017 or at such time and date as the parties may agree."

The $500,000 check that petitioner relies on was dated January 4, 2018, and was from ATM of America.[12] Petitioner did not introduce any evidence or testimony indicating that the parties to the sale agreed on a closing date and time other than 10 a.m. on December 31, 2017, as stated in the Purchase Agreement. Nor did he offer an explanation for why he received a check from ATM of America in exchange for his interest in Platinum Processing when the Purchase Agreement expressly states that Platinum Processing was to pay him for his interest. Finally, the Purchase Agreement states that the payment was to be made by a certified check or wire transfer. We see no indication that the check from ATM of America was a certified check.

Petitioner has not explained these discrepancies between the check and the express terms of the Purchase Agreement. We believe that they are significant and that they undermine petitioner's assertion as to the alternate source of the seized assets. It may be true that the parties acted in a haphazard manner in handling the payment terms for the sale of petitioner's interest in Platinum Processing, but on the wrong date, by the wrong method, the wrong person paid the wrong amount, to petitioner. Petitioner's explanation that the $500,000 "installment" paid by ATM of America to him on January 4, 2018, in exchange for his interest in Platinum Processing, which is not supported by testimony or consistent with documentary evidence, is not credible.

Similarly, petitioner argues on brief that the U.S. currency seized from Holy Moly Donut Shop was out of cash on hand and sales from the shop that occurred during 2018. Petitioner makes the same assertion with respect to the U.S. currency seized from Unified Collective, the unlicensed marijuana dispensary that petitioner and others operated. To support this contention, petitioner cites the plea agreement. However, the plea agreement offers no support for the contention, as it merely recites the fact that "Thirty Eight Thousand and Eighty Eight

---

[12] We note that the memo line on the check states "Acquisition of Platinum." Nevertheless, the method and manner of the payment were inconsistent with the express terms of the Purchase Agreement; and the memo line notation, by itself, is insufficient to convince the Court that the check was for petitioner's interest in Platinum Processing.

**[\*19]** Dollars ($38,088.00) in U.S. Currency [was] seized from Unified Collective on February 14, 2018."

Moreover, petitioner asks us to conclude that he had "very little involvement" in Unified Collective and that it was owned by James Shammas, "who was the primary focus of the investigation by the [DEA]." Petitioner, who chose not to testify, cites Shammas's testimony for support of this assertion. Again, the record and the testimony in this case do not support the assertion that Shammas was the owner of Unified Collective.

On direct examination by counsel for respondent, Shammas was asked what his role was at Unified Collective and he responded that he worked at Unified Collective and that he was its owner. Upon further questioning, however, Shammas contradicted himself and stated that he was not the owner of Unified Collective. Respondent's counsel asked Shammas about statements he had made during his safety-valve proffer[13] to Special Agent Dosch regarding Unified Collective. Specifically, respondent's counsel asked whether he recalled stating in the safety-valve proffer that he was paid a wage by Unified Collective, that he was an employee of Unified Collective, that he was the daytime manager of Unified Collective, and that he was not the owner of Unified Collective. Shammas responded that he did not remember making those statements to Special Agent Dosch.

Similarly, he did not remember that, at his sentencing hearing, he and his attorney both stated that he was an employee of Unified Collective. Respondent's counsel attempted to refresh Shammas's recollection of his role in Unified Collective by providing him a copy of the sentencing hearing transcript from his criminal case. After having his recollection refreshed with the relevant portions of the sentencing hearing transcript, Shammas testified that his role at Unified Collective was that of a manager and that he was not the owner of Unified Collective.

---

[13] The "safety valve" permits defendants who meet five requirements to be sentenced without regard to drug-quantity-based mandatory minimum penalty provisions. 2 Gerald F. Uelmen & Alex Kreit, *Drug Abuse and the Law Sourcebook* § 15:21 (2022). The safety valve is codified in 18 U.S.C. § 3553(f). A defendant can qualify for the safety valve by making a proffer that the five requirements in 18 U.S.C. § 3553(f) are satisfied. 2 Uelmen & Kreit, *supra*, at § 15:21; *see also U.S. Sent'g Guidelines Manual* § 5C1.2 (U.S Sent'g Comm'n 2023).

[*20] Additionally, respondent called Special Agent Dosch as a rebuttal witness to testify about the safety-valve proffer that he conducted with Shammas. Special Agent Dosch testified that, during the safety-valve proffer, Shammas stated that he was not the owner of Unified Collective.

On the basis of the testimony and all other evidence presented in this case, we do not find credible Shammas's testimony that he was the owner of Unified Collective. Accordingly, Shammas's testimony does not support petitioner's assertion that Shammas was the owner of Unified Collective and that the assets seized from Unified Collective were in fact Shammas's.

In a similar line of argument, petitioner asserts that certain other seized assets did not belong to him. Specifically, he asserts that the $50,000 seized from Safe Deposit Box #[XXXX] belonged to Jason Sitto, Lydia Sitto, and Ammouri. He also asserts that the $21,698 seized from a residence in Bloomfield Hills, Michigan, belonged to Ammouri. After the February 14, 2018 seizure, the DEA served notice of administrative forfeiture proceedings on all interested parties. On April 2 and 10, 2018, Ammouri filed administrative claims of ownership with the DEA for a return of (1) the $50,000 seized from Safe Deposit Box #[XXXX], (2) the $21,698 seized from his residence in Bloomfield Hills, Michigan, and (3) $112,520 in U.S. currency seized from the John R. Road location.

On February 15, 2019, Ammouri and the DEA entered into a Memorandum of Agreement wherein the DEA agreed to return to Ammouri the $50,000 seized from the safe deposit box and the $21,698 seized from his residence (returned property). The Memorandum of Agreement states that the DEA and Ammouri acknowledge that items (1)–(3) described above were seized by the DEA on February 14, 2018. The Memorandum of Agreement further states that the parties wished to resolve the matter without incurring further litigation and therefore certain of the seized assets were returned to Ammouri. Ammouri and the DEA also stipulated that the $112,520 seized from the John R. Road location was forfeited to the United States of America pursuant to 21 U.S.C. § 881(a)(6) and that Ammouri's right, title, or interest in the $112,520 was forever extinguished.

While the Memorandum of Agreement does not definitively establish ownership of the $50,000 that was stored in the safe deposit

[*21] box[14] and the $21,698 seized from the residence in Bloomfield Hills, Michigan, we find that the returned property should not be considered income to petitioner for the year at issue. The DEA may have agreed to return the property to avoid litigation hazards with Ammouri; however, it also suggests that the returned property was not owned by petitioner or generated from his illegal marijuana business.

On the other hand, the fact that Ammouri agreed to forfeit the $112,520 to the United States of America suggests that he did not own it and that it was generated through petitioner's illegal marijuana business.[15] As noted above, the indictment alleges that petitioner and his co-defendants used nominees to conceal the true identities of the owners of certain assets. This allegation, with its factual underpinnings, is a possible reason the DEA did not agree to return the $112,520 seized from the John R. Road location to Ammouri. In addition, the DEA may not have been willing to return the returned property to Ammouri unless he agreed to forfeit any right, title, or interest that he asserted in the $112,520. In other words, Ammouri agreed to forfeit his asserted right over the $112,520 to secure the return of the returned property and to avoid the cost and hazards of litigating these issues with the DEA.

Moreover, petitioner's conclusory assertion that the $112,520 seized from the John R. Road location belonged to ATM of America is not supported by the record. This is especially so considering that several businesses, including ATM of America, Platinum Processing, and others operated out of the John R. Road location. Petitioner has not provided any evidence that the $112,520 belonged to ATM of America aside from the Memorandum of Agreement. That document shows only that Ammouri filed an administrative claim with the DEA for return of those funds but that they were ultimately forfeited to the United States of America.

---

[14] The Court admitted into evidence the Safe Deposit Access Records and the Contract Entry Card for the safe deposit box. The Contract Entry Card states that the joint lessees of the safe deposit box were Jason Sitto, Lydia Sitto, and Ammouri. While these individuals jointly leased the safe deposit box, it does not definitively establish ownership over the $50,000 that was stored inside the safe deposit box. This is especially true in light of the fact that the indictment alleges that the co-defendants used nominees, including a nominee that owned a safe deposit box containing $197,140 in U.S. currency, in furtherance of their conspiracy to launder monetary instruments.

[15] The Government seized the $112,520 in U.S. currency on the basis of reasonable cause to believe that the seized U.S. currency was proceeds subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

**[\*22]** Finally, petitioner argues that the seized assets included other cash receipts for legal businesses that were generated in 2018. He asserts that the seizures of $1,685 and $4,439 from Holy Moly Donut Shop were out of cash on hand and sales from the shop in 2018. Petitioner relies on Holy Moly Donut Shop's February 2018 bank statement for support. The bank statement shows deposits made in February 2018 totaling $3,675. The amounts are identified as "Merchant Banked Deposit" and have a corresponding identification number. The bank statement alone is insufficient to satisfy petitioner's burden to show that the funds were from Holy Moly Donut Shop's cash on hand. We note that petitioner and his codefendants were alleged to have used nominees to conceal the true identities of the owners of assets and that Unified Collective, petitioner's unlicensed marijuana dispensary, was also in the same building as Holy Moly Donut Shop. Petitioner has failed to introduce evidence that the seized assets from Holy Moly Donut Shop were from cash on hand and sales from Holy Moly Donut Shop and not from Unified Collective, which was also at the Eight Mile Road location. Below, we turn to petitioner's argument that respondent's calculation of income is not supported by substantive evidence.

B.    *Whether Respondent's Calculation of Income Is Supported by Substantive Evidence*

Next, petitioner argues that respondent did not use an approved method of calculating the deficiency under section 446 and that therefore the notice of deficiency and the supplement to the notice of deficiency are arbitrary and erroneous. Petitioner further argues that respondent "presumed from the plea agreement that the assets seized in 2018 were income to Petitioners in 2017" and that respondent failed to trace the seized assets to the year at issue or consider to whom the assets belonged. Respondent argues that petitioner failed to keep books and records establishing his gross income and that therefore respondent may determine income under a method that, in the opinion of the Secretary, clearly reflects income. Respondent further argues that he had great latitude in reconstructing petitioner's income because (1) petitioner failed to keep books and records and (2) petitioner refused to cooperate with the revenue agent's examination. For the reasons discussed below, we hold that respondent's calculation of the deficiency is supported by substantive evidence.

Section 6001 requires all taxpayers to maintain sufficient records to determine their correct tax liabilities. Where a taxpayer fails to keep the required books and records, or if the records he or she maintains do

**[\*23]** not clearly reflect income, then the Commissioner is authorized by section 446 to determine income "under such method as, in the opinion of the Secretary, does clearly reflect income." § 446(b); *see Petzoldt v. Commissioner*, 92 T.C. 661, 693 (1989). The Commissioner is not limited to certain prescribed methods; rather he may use any method that clearly reflects income. *Walton*, 909 F.2d at 918; *Petzoldt*, 92 T.C. at 693. "Although the absence of adequate tax records does not give [the Commissioner] carte blanche for imposing Draconian absolutes, such absence does weaken any critique of [the Commissioner's] methodology." *Petzoldt*, 92 T.C. at 693 (citing *Webb v. Commissioner*, 394 F.2d 366, 373 (5th Cir. 1968), *aff'g* T.C. Memo. 1966-81. The Commissioner's reconstruction need only be reasonable in the light of all the surrounding facts and circumstances. *Giddio v. Commissioner*, 54 T.C. 1530, 1533 (1970).

Section 6212(a) provides for the issuance of a notice of deficiency where the Secretary "determines that there is a deficiency" in respect of certain taxes. However, the Code does not have statutory guidelines that "specif[y] the nature and quality of the evidence which the tax administrator must gather to support the determination, or the form and contents of the notice." *Petzoldt*, 92 T.C. at 693 (citing *Mayerson v. Commissioner*, 47 T.C. 340, 348 (1966)). Thus, the Commissioner has great latitude in reconstructing a taxpayer's income, and the reconstruction "need only be reasonable in light of all surrounding facts and circumstances." *Id.* at 687, 693. The Commissioner has even greater latitude when the case involves an illegal enterprise and the taxpayer fails to keep records or cooperate in the ascertainment of his income. *Id.* at 693. Mathematical precision is not required because if it were it "would be tantamount to holding that skillful concealment is an invincible barrier to proof." *Id.* at 693–94 (quoting *Llorente*, 74 T.C. at 266).

Petitioner's primary argument is that respondent did not use a traditional method, such as the net worth method or the bank deposits method, to determine petitioner's unreported income for the year at issue. Respondent's failure to use any of the traditional methods for reconstructing income indicates that the assessment lacks "any rational evidentiary foundation," according to petitioner.

Because petitioner did not keep books and records of the income received from the illegal marijuana business, respondent may compute petitioner's income using any method that clearly reflects income. *See id.* at 687 (citing *Meneguzzo v. Commissioner*, 43 T.C. 824, 831 (1965)).

[*24] We conclude that respondent's method here clearly reflects income.

An IRS revenue agent was assigned to petitioner's case in August 2019 to determine whether respondent would proceed with jeopardy assessments with respect to petitioner. The revenue agent testified that she reviewed the following information during the course of her investigation: (1) two search warrants from 2017, (2) three search warrants from 2018, (3) records regarding bank accounts and safe deposit boxes seized by the DEA, (4) petitioner's indictment, (5) court documents on PACER, (6) petitioner's plea agreement, (7) petitioner's tax returns for 2016 and 2017, and (8) Platinum Processing's Form 1065 for 2017. Additionally, on September 6, 2019, the revenue agent interviewed petitioner at his attorney's office. We note that the interview was held after petitioner signed the plea agreement on June 1, 2019, but before his sentencing hearing in November 2019. The revenue agent testified that, in the interview, petitioner answered basic background questions about himself but refused to answer any questions regarding income generated from the illegal dispensaries or illegal grow houses. Petitioner also failed to provide the revenue agent with documents that she requested.

On brief petitioner argues that there is no evidence that he refused to discuss his income and expenses with the revenue agent. We interpret this as petitioner's making a distinction between income and expenses generally and income and expenses associated with his illegal marijuana business. Additionally, in his response to respondent's proposed Findings of Fact, petitioner objects to respondent's Finding of Fact that petitioner refused to cooperate during the meeting with respondent's revenue agent, and states that his refusal to answer the revenue agent's questions about illegal dispensaries or illegal grow houses was based on assertion of privilege under the Fifth Amendment of the Constitution. Respondent argues that the Court should draw negative inferences from petitioner's failure to cooperate with the revenue agent during the September 6, 2019 interview, and his failure to testify during the trial.

Generally, the Fifth Amendment privilege applies in cases before this Court. *Petzoldt*, 92 T.C.at 684. However, this Court has held that "a taxpayer may not 'draw a conjurer's circle around the whole matter' of his or her tax liability" and that application of the privilege does nothing to shift the taxpayer's burden of proof. *Lee v. Commissioner*, T.C. Memo. 2002-95, 83 T.C.M. (CCH) 1470, 1473 (quoting *United States v. Sullivan*,

**[\*25]** 274 U.S. 259, 264 (1927)), *aff'd*, 61 F. App'x 471 (9th Cir. 2003). In *Petzoldt*, the Court explained:

> A valid assertion of the privilege against self-incrimination . . . is not a "substitute for evidence that would assist in meeting a burden of production," for to adopt such a view "would convert the privilege from the shield against compulsory self- incrimination which it was intended to be into a sword whereby a claimant asserting the privilege would be freed from adducing proof in support of a burden which would otherwise have been his."

*Petzoldt*, 92 T.C. at 684 (quoting *United States v. Rylander*, 460 U.S. 752, 758 (1983)). As this Court recognized in *Petzoldt*, in a civil proceeding the Court "may draw a negative inference from a party's invocation of his Fifth Amendment right against self-incrimination provided that there is some independent evidence in addition to the mere invocation of the privilege upon which to base the negative inference." *Id.* at 685.

Whether or not petitioner invoked the Fifth Amendment privilege in declining to answer the revenue agent's questions, we decline to draw a blanket negative inference from that event. Petitioner has not, however, invoked a Fifth Amendment privilege in this case. And if he had successfully done so, invocation of the privilege would not relieve him of his burden in this case. *See id.* at 684; *Lee*, 83 T.C.M. (CCH) at 1473.

As discussed above, petitioner has asserted that the seized assets were traced to money from the sale of Platinum Processing, that the assets belonged to third parties, or that the assets were other cash receipts from 2018. Petitioner could have cooperated with the revenue agent by providing his explanations and documents to establish these contentions. Nonetheless, on the evidence before the Court that links petitioner with the seized assets, it is unnecessary to decide whether petitioner properly invoked the Fifth Amendment privilege in his interview with the revenue agent and whether we should draw a negative inference from petitioner's refusal to answer the revenue agent's questions.

In the absence of books and records or petitioner's cooperation, the revenue agent reviewed the sources of information that were available to her. On the basis of this information, which included search

[*26] warrants, documentation regarding bank accounts and safe deposit boxes, the indictment, publicly available court documents, the plea agreement, petitioner's tax returns for 2016 and 2017, and Platinum Processing's Form 1065 for 2017, the revenue agent made a jeopardy assessment against petitioner for the year at issue in an amount equal to the assets forfeited in the plea agreement subject to a $200,000 reduction for the amount that the DEA agreed to return to petitioner. This Court has held that the Commissioner's reconstruction of income was reasonable where the taxpayer lacked contemporaneous records regarding the alleged income-producing activity, despite having the opportunity to preserve records. *See Barrington*, T.C. Memo. 2022-68, at *7 (sustaining the Commissioner's unreported income determination where the Commissioner reasonably reconstructed taxpayers' unreported income using admissions in taxpayers' plea agreements); *McHan*, 91 T.C.M. (CCH) at 1072 (holding Commissioner's reconstruction of taxpayer's income reasonable where taxpayer failed to maintain and produce records of illegal narcotics sales); *Franklin*, 65 T.C.M. (CCH) at 2502 (finding taxpayer's general denial of Commissioner's notice of deficiency determination insufficient to carry burden of proof).

Finally, petitioner argues that respondent did not trace the assets that were seized in 2018 to the 2017 tax year. This seems to be an extension or variation of petitioner's argument that we have already rejected, i.e., that the seized assets were actually from the sale of petitioner's interest in Platinum Processing in the 2018 tax year. To the extent that petitioner's argument may instead be that, regardless of the source of the funds, respondent did not demonstrate that they were income to petitioner for the year at issue, we believe that the record supports respondent's determination that the seized assets were income to petitioner for the year at issue.

Among the items seized from petitioner's home during the execution of the October 2017 search warrants were four cellular phones, an iPad, and various documents. The documents included ledgers with some undated entries and some entries dated in the 2016 and 2017 tax years; the ledgers contained the names, quantities, prices (in some cases), and dollar values of marijuana strains. The evidence also included text messages from telephone numbers associated with petitioner in which he communicated with associates, customers, and suppliers of a marijuana operation during the tax year at issue. These documents and communications were seized during a multiyear DEA investigation that began in 2015 and culminated with the execution of

**[\*27]** the October 2017 search warrants. When all of the evidence is considered, the ledgers and phone communications clearly tie petitioner to sales of significant amounts of marijuana during the year at issue. Accordingly, respondent's determination that the assets seized during the execution of the February 2018 search warrant were petitioner's unreported income for the year at issue is supported by the record.

Considering all of the facts and circumstances presented and petitioner's lack of cooperation, we conclude that it was reasonable for the revenue agent to reconstruct the income that petitioner generated from the illegal marijuana business in this manner and that respondent's calculation of income is supported by substantive evidence.

C.     *Conclusion*[16]

In sum, we find that the unreported income attributed to petitioner in the supplement to the notice of deficiency should be reduced to reflect the returned property (totaling $71,698) that the DEA returned to Ammouri. Accordingly, we conclude that petitioner failed to report income of $441,079 [$512,777 − $71,698 (returned property)]. Petitioner has not otherwise met his burden of rebutting the determinations in the notice of deficiency and the supplement to the notice of deficiency.

V.     *Section 6662(a)*

Section 6662(a) imposes a 20% penalty on the portion of an underpayment of tax that is attributable to a "substantial understatement of income tax." § 6662(b)(2). Section 6662(d)(2) generally defines an "understatement" as the excess of the tax required to be shown on the return over the amount shown on the return as filed. An understatement of income tax is "substantial" if it exceeds the

---

[16] In the Petition, petitioners also alleged that respondent erred in the notice of deficiency and in the supplemental notice of deficiency in disallowing itemized deductions and personal exemptions and in making a self-employment tax adjustment for the year at issue. *See* Petition ¶¶ 5(b), (c), and (f). Petitioners did not address these issues at trial or on brief, and we deem petitioners to have conceded respondent's adjustments to income by disallowing petitioners' itemized deductions and personal exemptions and making a self-employment tax adjustment. We may deem a taxpayer to have conceded an issue that was raised in the petition if he or she made no argument at trial or on brief relating to that issue. *See Collins v. Commissioner*, T.C. Memo. 2002-115, 83 T.C.M. (CCH) 1620, 1624 (first citing *Levin v. Commissioner*, 87 T.C. 698, 722–23 (1986), *aff'd*, 832 F.2d 403 (7th Cir. 1987); and then citing *Zimmerman v. Commissioner*, 67 T.C. 94, 104 n.7 (1976)).

**[\*28]** greater of 10% of the tax required to be shown on the return or $5,000. § 6662(d)(1)(A). The Commissioner generally bears the burden of production with respect to the liability of an individual for any penalty. § 7491(c).[17]

For the year at issue, petitioners reported a tax liability of $70,487 on the 2017 return. Their corrected tax liability as shown on the supplement to the notice of deficiency was $281,938, which was based in part on respondent's determination that petitioners failed to report $512,777 of income. We have here concluded that petitioners instead failed to report income of $441,079 [$512,777 − $71,698 (returned property)]. Even with this downward adjustment, however, there is an underpayment of tax required to be shown, all of which is attributable to a substantial understatement of income tax. Respondent has satisfied his burden of production under section 7491(c).

Once the Commissioner satisfies his burden of production with respect to the accuracy-related penalty, the taxpayer then bears the burden of proving that the Commissioner's determination is incorrect or that he has an affirmative defense, such as reasonable cause and good faith under section 6664(c)(1). *See* Rule 142(a); *Higbee v. Commissioner*, 116 T.C. 438, 446–47 (2001). Petitioner has not shown that he acted with reasonable cause and in good faith with respect to any portion of the underpayment. We hold that petitioner is liable for a section 6662(a) accuracy-related penalty to be computed in accordance with Rule 155.

We have considered all other arguments made and facts presented in reaching our decision, and, to the extent not discussed above, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

[17] We note that petitioner conceded that respondent satisfied the supervisory approval requirements of section 6751(b).